Maxwell S. FOGEL and Anna Fogel

v.

FORBES, INC., James Michaels, Phyllis Berman.

Civ. A. No. 77–4259.

United States District Court, E. D. Pennsylvania.

July 29, 1980.

David Freeman, Philadelphia, Pa., for plaintiffs.

Jerome J. Shestack, Diana S. Donaldson, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendants.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

### I.

This is an action for defamation and invasion of privacy brought on the basis of diversity jurisdiction in which plaintiffs seek compensatory and punitive damages. Presently before this Court is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Defendants in this action are Forbes, Inc., James Michaels, Editor of Forbes Magazine and Phyllis Berman, author of the article in which the photograph that sparked this litigation appeared. Defendants' motion alleges that the pleadings, depositions and exhibits establish that there is no genuine issue as to any material fact and because defendants are entitled to judgment as a matter of law, summary judgment should be entered in favor of all defendants. Plaintiffs have responded to this motion and have submitted an accompanying exhibit and affidavit. Defendants then submitted a reply to plaintiffs' response to defendants' motion for summary judgment. For reasons set forth herein, defendants' motion for summary judgment is granted.

### II. UNDISPUTED FACTS

Plaintiffs, Dr. Maxwell Fogel and Anna Fogel, his wife, while on a trip to Guatemala, had their picture taken without their consent while standing at an airline counter, next to a quantity of boxes in the Miami International Airport. A researcher for Forbes Magazine arranged to have the picture taken to illustrate an article entitled "Miami: Saved Again". The article and the photograph appeared in the November 1, 1977 issue of Forbes Magazine.

This article deals with the beneficial economic impact of increased investments and

purchases by Latin Americans in the Miami area. The author of the article explains that Latin Americans travel to Miami to shop for consumer goods because of the tremendous inflation and "shoddy merchandise" in the Latin America countries. The article states that merchandise purchased in the United States is considered a "real bargain" by the Latin American shoppers. The article points out that huge profits are made by the Latin American shoppers when they resell the goods back home at three to four times the price that they paid for them. The author concludes that the huge profits that these Latin Americans are making and their willingness to spend and invest their profits in the Miami area are revitalizing the Miami economy. The photograph of the plaintiffs which accompanies the article is captioned, "The Load: Some Latins buy so much in Miami they've been known to rent an extra hotel room just to store their purchases." At least three people other than the plaintiffs appear in the photograph with the many boxes of merchandise. The plaintiffs are not identified either in the photograph or in the article. As a result of the aforesaid publication by Forbes Magazine, plaintiffs claim that they have been libeled and that their privacy has been invaded.

### III.   APPLICABLE LAW

The Court agrees with the parties that the law of the Commonwealth of Pennsylvania is applicable in this diversity action. Therefore, this Court must determine how the Pennsylvania courts would resolve the substantive issues presented by this motion for summary judgment. *See, e. g. Avins v. White*, 627 F.2d 637, Nos. 79–1747, 79–1748 (3d Cir. June 30, 1980).

■ Under Pennsylvania law the torts of defamation and invasion of privacy are separate and distinct torts. *Uhl v. Columbia Broadcasting Systems, Inc.*, 476 F.Supp. 1134 (W.D.Pa.1979). Therefore, this Court will separately examine defendants' motion on the defamation claim and the invasion of privacy claim.

### IV.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—DEFAMATION CLAIM

Defendants in support of their motion for summary judgment with respect to plaintiffs' defamation claim contend that the photograph, caption and article cannot support the meaning alleged by the plaintiff and that the meaning alleged is not defamatory. The defendants also claim that the plaintiffs have admitted that they cannot prove any damage to their professions as a result of defendants' publication.

#### A.   The Non-Defamatory Character of the Communication

■ Our initial substantive inquiry is whether, as a matter of Pennsylvania law, the communication published by defendants in Forbes Magazine on November 1, 1977 is capable of a defamatory meaning. As stated by Judge Adams in *Steaks Unlimited v. Deaner*, 623 F.2d 264 at 270–271 (3d Cir. 1980), "In Pennsylvania, 'it is the function of the court, in the first instance, to determine whether the communication complained of is capable of a defamatory meaning. . . . If the court . . . [so finds], it is for the jury to determine whether it was so understood by the recipient . . . .' Thus, our initial substantive inquiry is whether, as a matter of Pennsylvania law, the statements made . . . are capable of a defamatory meaning such that there might exist a genuine issue of fact in this regard." It is therefore the function of this Court to determine, whether under Pennsylvania law, the communication complained of is capable of a defamatory meaning. "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from dealing with him." *Franklin Music Co. v. American Broadcasting Co. et al.*, 616 F.2d 528 at 541 (3d Cir. 1979); *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 442, 273 A.2d 899, 904 (1971); *Cosgrove Studio and Camera Shop, Inc. v. Pane*, 408 Pa. 314, 318, 182 A.2d 751, 753 (1962); Restatement (Second) of Torts § 559 (1977).

■ Pennsylvania courts follow the Restatement in defamation cases. *Pierce v. Capital Cities Communications, Inc.*, 576 F.2d 495, 502 (3d Cir. 1978). Comments (b) and (d) of Section 614 of the Restatement (Second) of Torts (1977) contain guidelines for making the determination as to whether the communication is capable of bearing a particular meaning and whether that meaning is defamatory. Comment (b) states that:

> The Court determines whether the communication is capable of bearing the meaning ascribed to it by the plaintiff and whether the meaning so ascribed is defamatory in character. If the court decides against the plaintiff upon either of these questions, there is no further question for the jury to determine and the case is ended. If, on the other hand, the judge decides that the communication is capable of bearing the meaning in question and that the meaning is defamatory, there is then the further question for the jury, whether the communication was in fact understood by its recipient in the defamatory sense. Restatement (Second) of Torts § 614 comment (b) (1977).

Comment (d) states that:

> In determining the defamatory character of the language, the meaning of which is clear or otherwise determined, the social station of the parties in the community, the current standards of moral and social conduct prevalent therein, and the business, profession or calling of the parties are important factors. Thus an imputation may be defamatory as to one person at a given time and place, although it would not be derogatory of another person at a different time or in a different place. *Id.* comment (d).

There is no question as to the content of the alleged defamatory publication. It is attached hereto as Appendix A. This Court has carefully scrutinized the publication and finds, as heretofore stated, the article discusses the alleged economic benefits to Miami as a result of certain Latin Americans purchasing large quantities of merchandise in Miami which they resell at a profit in their native countries. The photograph in which the plaintiffs appear is captioned *"The Load* : Some Latins buy so much in Miami they've been known to rent an extra hotel room just to store their purchases." It is a photograph which was taken at the Miami International Airport and shows the plaintiffs at a ticket counter in front of which are stacks of merchandise. At the time the photograph was taken the plaintiffs were checking on a flight to South America. The plaintiff, Dr. Fogel, is a dentist specializing in the practice of orthodonture in the Philadelphia area and the plaintiff, Mrs. Fogel, is his wife. She is the office manager in Dr. Fogel's dental office.

■ The plaintiffs are not mentioned or identified in the entire article. The plaintiffs claim that their appearance in the photograph creates the innuendo that they are participating in the activity described in the article, that is, buying merchandise in Miami for sale in Latin America. Plaintiffs also claim that their appearance in the photograph creates the innuendo that they are masquerading as citizens of another country. The caption to the photograph in question focuses the readers' attention to the boxes of merchandise in the photograph. The plaintiffs' appearance in the photograph is obviously incidental and does not in any manner imply that they are participating in the activity discussed in the article (nor does it imply that anyone is masquerading as a citizen of another country). The Court finds that the picture and the article are not reasonably capable of conveying the meaning or the innuendo ascribed by the plaintiffs. As the Supreme Court of Pennsylvania has said on numerous occasions, if the publication is not in fact libelous, it cannot be made so by innuendo which puts an unfair and forced construction on the interpretation of the communication. *Bogash v. Elkins*, 405 Pa. 437, 176 A.2d 677 (1962); *Sarkees v. Warner-*

*West Corp.*, 349 Pa. 365, 37 A.2d 544 (1944). Furthermore, assuming that the article and the picture were reasonably capable of conveying the meaning and innuendo ascribed by the plaintiffs, the Court finds that such meaning is not defamatory as to these plaintiffs. Dr. Fogel and Mrs. Fogel are not engaged in the business of buying and selling merchandise. As Dr. Fogel testified in his deposition, the plaintiffs are without evidence to prove: (a) that anyone has been deterred from associating with them, (b) that their reputation has been lowered in the community, and (c) that their profession has suffered as a result of the article.

B. *Defendants' Claim of No Proof of Damages*

Pennsylvania defines by statute a plaintiff's burden of proof in a defamation action:

(a) *Burden of plaintiff.*—In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Specific harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion. (42 Pa. C.S.A. § 8343(a) Supp. 1980).

█ Plaintiff, Mrs. Fogel, claims compensatory damages in the amount of $100,000 and punitive damages in the amount of $300,000. The plaintiff, Dr. Fogel, claims compensatory damages in the sum of $300,000 and punitive damages in the amount of $900,000. The only allegation of injury in the complaint is paragraph 16 which reads:

16. . Maxwell S. Fogel has been greatly damaged in the practice of his profession and in all other aspects of his career in dentistry. He depends on referrals from dentists and others for his practice and the unprofessional conduct implied by the article and photograph will deter such referrals and reflect on his reputation as an author, lecturer and devisor of instruments and techniques. Anna Fogel has been damaged in her profession as dental office manager since she is associated with her husband as such in the practice of her profession.

As heretofore pointed out, the plaintiffs, in response to questions in their depositions, were unable to state any "special harm resulting to the plaintiffs from its publication." Proof of "special harm" under the Pennsylvania defamation statute requires proof of a specific item of damage. As stated in *Altoona Clay Products v. Dun & Bradstreet, Inc.*, 246 F.Supp. 419 at 422 (1965), *rev'd on other grounds*, 367 F.2d 625 (1966),

The most detailed statement of the Pennsylvania rule is contained in *Shaines v. R. G. Dunn & Co.*, 8 Pa.Dist. & Co. R 597 (Phila. County, 1972). Under this case special damages means actual and concrete damages capable of being estimated in money, established by specific instances such as actual loss due to withdrawal of trade [or] particular customers, or actual loss due to refusal of credit by specific persons, all expressed in figures. These are requirements of pleading as well as proof.

█ Apart from the statutory requirement quoted above, the courts in Pennsylvania also require proof of special damage in defamation cases which are not actionable "per se". The parties agree that the publication in this case is not actionable "per se". *See Altoona Clay Products v. Dun & Bradstreet*, 367 F.2d 625 (1966). As stated by the Pennsylvania Supreme Court in *Baird v. Dun & Bradstreet*, 446 Pa. 266, 285 A.2d 166 (1971), "It is a general rule

that defamatory words are not actionable, absent proof of special damages." 285 A.2d at 171. In their depositions, the defendants admit that they are unable to prove any special harm. The plaintiffs, being unable to prove "special harm" or "special damage" are unable to establish an essential element of a defamation action under Pennsylvania law.

Accordingly, an order will be entered granting summary judgment to the defendants in connection with plaintiffs' defamation claim for the reasons herein discussed, that is, (1) the picture and article are not reasonably capable of conveying the meaning or innuendo asserted by the plaintiff, (2) the meaning or innuendo ascribed by the plaintiff is not defamatory, and (3) plaintiffs are unable to establish "special harm" or "special damage".

## V. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—INVASION OF PRIVACY CLAIM

■ In addition to their defamation claim, plaintiffs claim that defendants have "unreasonably invaded their privacy for the purpose of making a profit." Pennsylvania courts have adopted Sections 652B through 652E of the Restatement (Second) of Torts, which separates invasion of privacy into four distinct torts:

652B—Intrusion upon seclusion

652C—Appropriation of name or likeness

652D—Publicity given to private life

652E—Publicity placing person in false light

*Boyle v. High Society Magazine, Inc. and Leonard*, No. 79–4399 (E.D.Pa. June 10, 1980); *Marks v. Bell Telephone Co. of Pa.*, 460 Pa. 73, 331 A.2d 424 (1975); Restatement (Second) of Torts § 652B–E (1977). According to the plaintiffs, their privacy has been unreasonably invaded and they base their claim upon Sections 652B and 652E of the Restatement.

■ The court will first examine plaintiffs' claim that their privacy was in-

vaded on the basis of "Intrusion upon seclusion" which is Section 652B of the Restatement. Under this Section the plaintiffs must show that some aspect of their private affairs has been intruded upon. However, this tort does not apply to matters which occur in a public place or a place otherwise open to the public eye. *See Boyle, supra*; Restatement (Second) of Torts § 652B, comment c. (1977). Comment c. of Section 652B states:

The defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs. Thus there is no liability for the examination of a public record concerning the plaintiff, or of documents that the plaintiff is required to keep and make available for public inspection. Nor is there liability for observing him or even taking his photograph, while he is walking on the public highway, since he is not then in seclusion, and his appearance is public and open to the public eye. Even in a public place, however, there may be some matters about the plaintiff, such as his underwear or the lack of it, that are not exhibited to the public gaze; and there may still be invasion of privacy when there is intrusion upon these matters.

The undisputed facts in this case cannot serve as the basis for a Section 652B cause of action since the photograph was taken at the Miami Airport, a place open to the general public.

■ Plaintiffs also claim that their privacy was invaded on the basis of Section 652E which is entitled "Publicity placing a person in a false light." In order for there to be liability under Section 652E, it is not necessary that the matter publicized be private, or that it be in and of itself false and defamatory. It is enough that the defendant has given publicity to any matter concerning the plaintiff that creates a "highly offensive" false impression about the plain-

tiff. It is essential, however, that the matter published concerning the plaintiff be untrue. Comment b. to Section 652E states, "The interest protected by this Section is the interest of the individual in not being made to appear before the public in an objectionable false light or false position, or in other words, otherwise than he is."

■■■ The cause of action "Publicity placing a person in false light" is closely allied to the law of defamation although it is not necessary to this cause of action that the plaintiff be defamed. Restatement (Second) of Torts § 652E, comment b. However, as a result of its similarity to defamation, the courts have applied to the "Publicity placing person in false light" actions some of the same considerations that govern defamation actions. *Boyle, supra; Rinsley v. Brandt*, 446 F.Supp. 850, 854 and n. 1 (D.Kan.1977). *See also* Hill, *Defamation and Privacy Under the First Amendment*, 76 Colum.L.Rev. 1205, 1207 (1976); Bloustein, *The First Amendment and Privacy: The Supreme Court Justice and the Philosopher*, 28 Rutgers L.Rev. 41, 91–2 (1974). As heretofore pointed out in our discussion of the law as to defamation in Pennsylvania, it is for the court to determine whether the communication is capable of bearing a particular meaning and whether that meaning is defamatory. The meaning ascribed by plaintiffs to the publication in connection with their claim of invasion of privacy is the same as claimed by them in their defamation claim. For the reasons set forth in connection with the defamation claim we find that the picture and the article are not reasonably capable of conveying the meaning or the innuendo ascribed by the plaintiffs as the basis for their invasion of privacy claim. In addition, assuming that the article and the photograph were reasonably capable of conveying the meaning ascribed by the plaintiffs, the court finds that such meaning does not place the plaintiffs before the public in a "false light", highly offensive to a reasonable person.

■■■ Furthermore, comment e. under Section 652E in discussing the fact that the courts have applied to invasion of privacy actions the rules governing defamation actions states: ". . . These restrictions include, for example, the requirement that special damages be pleaded and proved by the plaintiff in any case in which the defamatory words are not actionable per se. Since the requirement of special damage is likewise applicable to invasion of privacy based upon "Publicity placing person in false light", and since plaintiffs in their depositions stated that they were unable to prove special damage, the plaintiffs are unable to establish an essential element for such a claim.

■■■ Although the plaintiffs rely solely on Sections 652B and 652E of the Restatement (Second) of Torts (1977) as the basis for their invasion of privacy claims, the court has, nevertheless, considered whether the undisputed facts would support an invasion of privacy claim under Section 652C. Section 652C is entitled "Appropriation of Name or Likeness". As pointed out in comment b. under Section 652C, the common form of invasion of privacy under this section is the appropriation and use of the plaintiff's name or likeness for some commercial purpose. However, as stated in comment c. under this section, in order to establish liability under Section 652C, the defendant must have appropriated to his own use or benefit the reputation, prestige, social or commercial standing, public interest or other values of the plaintiff's name or likeness. Until one or more of such values is appropriated, there is no invasion of privacy under Section 652C. The plaintiff makes no claim of any such appropriation and the undisputed facts do not support any such claim. Furthermore, the use of a photograph to illustrate a newsworthy article is "not such an appropriation" within the meaning of Section 652C. As stated in comment d. under this Section:

The fact that the defendant is engaged in the business of publication, for example

of a newspaper, out of which he makes or seeks to make a profit, is not enough to make the incidental publication a commercial use of the name or likeness. Thus a newspaper, although it is not a philanthropic institution, does not become liable under the rule stated in this Section to every person whose name or likeness it publishes.

See *Jenkins v. Dell Publishing Co.*, 251 F.2d 447 (3d Cir. 1958); *Neff v. Time, Inc.*, 406 F.Supp. 858 (W.D.Pa.1976). The undisputed facts before this court show that the photograph on which the plaintiffs base their cause of action appeared in a news magazine to illustrate a newsworthy article and the plaintiff's appearance in the photograph is merely incidental to the showing of the merchandise discussed in the article.

▆ In the event, however, the substantive law of Pennsylvania as to defamation or invasion of privacy may have been misconstrued in any of our foregoing analyses, under the undisputed facts presented in this summary judgment motion since the publication of the photograph in this case was for the sole purpose of illustrating a newsworthy article, the defendants would be entitled to summary judgment on constitutional grounds. Heeding the admonition that when a case may be disposed of on non-constitutional grounds constitutional issues should not be decided, we have not determined the motion on the basis of the constitutional issue. *Pierce v. Capital Cities Communications, Inc.*, 576 F.2d 495 (3d Cir. 1978).

Accordingly, an order will be entered granting summary judgment to the defendants in connection with plaintiffs' invasion of privacy claims for the reasons herein set forth.

Appendix to follow.

## APPENDIX

# Miami: Saved Again

### Switzerland? No, it's southeast Florida. All that refugee money is putting the glitter back in the Gold Coast.

**By PHYLLIS BERMAN**

LIKE next year's orange crop, something always seems to come along to save Florida. After the late 1920's land bubble burst, it was affluent northern tourists, then World War II. There was a boom of retirement communities in the Fifties, Cape Canaveral and the space program in the Sixties, condominium construction in the early Seventies. Now, with the bloom off tourism and construction, a Latin America capital flood has arrived just in time, and it may be the biggest, fattest orange of all.

Billions of dollars of hard cash—a net increase in deposits of over $5 billion since 1975 alone according to Federal Reserve figures—to say nothing of equity money in everything from real estate to textiles, have been flooding into the U.S. from the oil-rich, politically unstable or inflation-ridden countries of Latin America. And hundreds of millions of dollars are being funneled into southeast Florida, the boom-and-bust resort area that is booming once again.

"See this?" asked the handsome 32-year-old banker, holding up an undistinguished-looking brown attaché case. "Last month, I brought $672,000 into the country in it."

Bravado is the byword. "Last year," he goes on, "a South American walked into the bank after 5 p.m.—when the vault was closed—with three suitcases containing $1.2 million. The manager wanted to call in a special guard, but I told him: 'Look, I've seen Latins who keep more than that in their mattresses. I'll stay tonight and watch the money.' It took five hours to count it the next morning." He holds out his arms like a fisherman describing a catch: "It was *this* big and *this* high."

Despite such colorful stories, Casablanca it is not. Most of the money comes to Miami in more mundane, open ways. Flowing from a huge area of the Caribbean, Central America and South America, that extends from Jamaica to Chile, it enters the U.S. with varying degrees of difficulty and by hundreds of methods.

For the fact is that, more than Europe, Latin America is facing a time of trial, as hopes for gradual amelioration of the peasant's lot fades, population pressures grow and "revolution," however fruitless, looms. Few rich Latins intend to live their own private version of the Cuban experience—that is, if they can avoid it. "They come to visit their old pals from Havana who used to take them yachting and find them cutting grass," says a banker. "They vow it won't happen to them."

Stimulating the whole process is the U.S. tax code and its cushy incentives for foreign investment. Says tax lawyer Jor-

**Sign Of The Times:** Signs like this are common in once-provincial Miami.

dan Bittel of Miami's Bittel, Langer & Blass: "A foreigner can minimize or avoid entirely almost all the taxes that U.S. investors have to pay—U.S. estate and gift taxes, taxes on dividends and interest, capital gains tax and corporate income tax—if the investment is handled properly. One thing the Latin has to do is avoid buying anything in his own name and buy it through a foreign corporation instead."

The effect on south Florida has been electric. The deluge is so great that there are $150,000-plus savings accounts in Miami collecting no interest at all. That's right: *no* interest. Southeast First National Bank of Miami (a subsidiary of Southeast Banking Corp., Miami's biggest bank, with more than a half-billion dollars in foreign deposits) announced 18 months ago, when interest paid on CDs fell below that of regular savings accounts, that it would no longer pay interest on amounts above $150,000 that remained in savings accounts. "There was no big runoff from those accounts," says Thomas B. Walker, Southeast's economist. Much of the big money stayed there—drawing zero interest. "The Latin can be pretty unsophisticated about his investments," explains Chilean-born Hugo Zamorano of Continental Interamerica Corp., which advises Latin American investors in Miami. "What he's most concerned about is preservation of principal. He often cares less about making money than keeping what he's got."

Starting in the late Sixties, the big banks from Atlanta, California and New York—like Citizens & Southern, Bank of America and Citibank—started opening up Latin-staffed offices in Florida. Just six months ago Morgan Guaranty opened the 11th such office. (Banks are permit-

ted to move interstate under the Federal Edge Act, as long as they do only international financing and take only foreign deposits.) Officially, the big banks were moving into Florida to service the short-term trade transactions of the scores of big multinationals that had established their Latin branches there. But the real object of their move was refugee capital.

Secrecy is often a standard operating procedure. Many accounts are numbered. Lawyers, brokers and bankers won't divulge clients' names. "If a client got on a plane from Rio to Miami, picked up your magazine and saw the specifics of his deal," says Richard S. Lehman, an international tax consultant, "it would kill our business." It might kill the client, too.

Banks are only the beginning. Real estate is starting to move again, thanks in major part to Latin dollars. "Land has always held a fascination for Latins. It's their traditional hedge against inflation," says Frank J. Preve, head of Citizens & Southern's Edge Act in Florida. "And the downturn in 1974 taught Latins the value of income-producing properties like shopping centers and apartment buildings, as opposed to speculative holdings in raw land."

At the low end of the real estate market, companies like General Development unload cleared land in developments in outlying Florida areas in one- or two-lot parcels on less affluent Latins who may never even see the property they are buying. General Development works through an independent franchised representative, Nicholas Morley, whose contacts are so good that ex-President Richard Nixon chose him to accompany his wife as a special ambassador on a South American tour in 1974. These independent representatives can charge a 30% commission, but developers pay it gladly. The reps have lots of cash customers.

The more affluent—but not really rich—Latins are buying condominiums, either on the water or in Key Biscayne (Nixon's Florida home has become a haven for Latins). In fact, says Raul J. Valdes-Fauli, a Cuban-born, Harvard-educated Miami lawyer, "About one-third of all high-priced, luxury condominiums in the area are in Latin hands."

The superrich Latins are buying banks and shopping centers, setting up businesses and establishing real estate investment funds. Their money usually flows through tax lawyers like Miami's newly formed firm of Barron & Lehman, founded by two former Internal Revenue Service lawyers who have been enjoying the Latin bonanza for just 2½ years. In that period the firm has closed a reported $130 million worth of real estate transactions for Latin clients. Richard S. Lehman and Ronald M. Barron work in tandem with realtors like Paul Skoric of Soundvest Properties, Inc. Says Skoric: "Most of my clients come up here for three or four days. The wife goes directly to the new Omni International Hotel to do her shopping, I rent a twin-engine plane to take her husband shopping too—for apartment buildings and shopping centers."

Skoric shows four properties in a day to a single customer, and the deals are consummated quickly so that the buyer can get back home to his own business. "Just last month," Skoric recalls, "I got a Latin customer to agree to buy an 80,000-square-foot shopping center in

**La Vida Dulce:** Latins who carry suitcases full of cash to Miami will find no shortage of ways to blow it. The hotel suite (*left*) in Miami's new Omni International Hotel goes for $425 a night. Last month Omni's manager said the suite was booked for the next four weeks. Emilio Pucci and Hermès *(below)* are not the only purveyors of luxury goods and apparel at Omni's shopping center. Among 163 others are Givenchy and Lanvin.

Jacksonville for $400,000 up front. It took me 3½ days to negotiate the price. By 1 p.m. Tuesday, Rich Lehman of Barron & Lehman was still knocking out a contract. My client was leaving at 2:30 p.m With contract in hand, I ran down the airport concourse, and we ended up signing the deal on each other's back."

The most sophisticated Latins are scrambling for a piece of the action themselves. Latin Americans have purchased five small Florida banks this year. Michael Weintraub, president of Pan American Bancshares (assets. $657 million), has sold one bank to Panamanians for $3.4 million and another to a group of Venezuelans for $4.8 million—both for cash. Recently Latins have begun buying shoe and textile manufacturers, shipping companies, realty brokerage firms and other odds and ends around Miami. And lawyer Valdes-Fauli has raised initial capital from Latin Americans to construct Miami's projected $60-million new free-trade zone.

Latins are also the ultimate big spenders when it comes to retail sales. "They're buying like you've never seen in your life," says Frank Thorn, general manager of the $76-million Omni International Hotel, a virtual minicity which caters to Latin clientele. "It isn't unusual for someone to go out during a one-week stay and buy four Cadillacs, a BMW and a Rolls."

The Omni has one suite that rents for $425 a night. In constant demand since the hotel opened in June, it has two levels, four bedrooms with marble baths and two terraces (each with room enough for 60 people to party) which overlook Miami's downtown and bay. "I have a family here from Venezuela who would like that suite for the next four weeks," says Thorn casually "Unfortunately, it's booked."

Omni's 165 stores—ranging from Grandma's Homemade Ice Cream to posh clothier Hermès—draw the Latins. "It's not unusual for people to arrive with

$50,000 to $100,000 in cash in their suitcases," says Thorn Omni's retail general manager Ted de Swart says the average Venezuelan can spend $900 per store. That just means that Thorn sometimes has to rent out an extra hotel room to shoppers just to store their purchases.

One of Omni's best customers is the wife of Lynden O. Pindling, prime minister of the Bahamas. "She comes up here about once a month and shops like she's got six arms," says de Swart. "It's interesting to ponder how an elected official has all that money to throw around." Pindling was an attorney before his election.

Soaring inflation and shoddy merchandise at home make U.S. goods a real bargain. "It's just a heck of a lot cheaper, even with duties," says Ricardo J. Robles, manager of Cargill's Latin operations in Miami "A hi-fi that costs $500 here might cost $2,000 in Argentina. If they can even get it. So the Latin buys everything from medicine and educational books to washing machines and furniture in Miami Besides, a suit bought here might last four times longer than one they buy at home."

Diamonds are big, of course; they're portable. Other items often on the Latin's shopping list. $3,500 gold Rolex watches or platinum versions at $12,125. "We sell the gold ones by the dozens at each clip. Or one customer may buy two or three platinum ones," says Irving Getz of Mayor's Jewelers, Florida's largest jewelry chain. "And we don't give discounts, either."

Why does so much of this money come to south Florida? Why not New York or Los Angeles? The answer is cultural. Florida's Dade County now has 600,000 Cuban-Americans and other Latins—they make up better than one-third of the area's total population. They are mainly refugees from Castro's Cuba and have given the city a strong Latin flavor. Cubans staff the Edge Act bank offices and the offices of the 83 multinationals like Dow Chemical, Texaco and Exxon in nearby Coral Gables. Other Cuban refugees have started dozens of small export/import businesses or have opened stores along Flagler Street that cater to the Latin tourists. Some, like Manuel Vergara, are prominent Miami businessmen—Vergara is president of Total Bank (assets: $48 million). His 28-year-old nephew, Jose Rosado, has even bigger plans. With family help, he is setting up a $10-million real estate investment fund. "We don't want investors with $50,000," says Rosado. "We're looking for $500,000 minimum. It will be easy to get the Latin dollar. The money is certainly there."

The Cubans are to the Southern Hemisphere what the overseas Chinese are to the Far East. The result is a "Cuban connection" throughout the

**The Lure:** Latins who shop in Miami find better prices and quality than at home on everything from TV sets and calculators to medicine and books.

**The Load:** Some Latins buy so much in Miami they've been known to rent an extra hotel room just to store their purchases.

hemisphere. And it is through this network that much of the money flows.

It flows with varying degrees of ease. In oil-rich Venezuela, says Edward L. Hoyt, president of Morgan Guaranty's Edge Act office in Miami, "you just take bolivars to your friendly bank and ask them to transfer dollars to your U.S. account."

It's not so easy elsewhere, but it can be done. One Latin American businessman, an optical lens manufacturer who owns three luxury condominiums on Miami Beach, has systematically transferred assets to Florida in small amounts for years. He buys much of the raw material for his business in the U.S. He explains: "If the cost of material I receive is $35,000, I have the invoice made out for $50,000. I pay the full amount and the exporter deposits the $15,000 in my savings account in Florida." To be sure, there are risks. Says the optical lens maker: "In Colombia or Peru, you might be fined or get a year or two in jail. But the Colombians and the Peruvians are still getting the money out. They own condominiums right in this building."

In left-leaning Jamaica, fear is finding a way. Says Omni's Ted de Swart: "The Jamaican upper and middle class is leaving the country. They're so desperate to get dollars out that they've even resorted to marijuana. They'll consign a load of

grass in Jamaica from a local supplier, pay him in Jamaican currency and sell it to drug sellers in the U.S. for dollars— usually at a 50%-discounted rate; the guy delivers $500,000 worth of grass, but he'll get only $250,000 deposited to his account here."

To the Miami Chamber-of-Commerce types, however, all this raises some attractive possibilities. Can the money be retained and used to turn Miami into an international banking and trade center? With eroding beaches, decrepit hotels and periodic gluts of condominiums, can the Gold Coast become the Zurich of the Sun Belt?

There are some signs that this is already happening. Over the past five years, according to Dr. Jan B. Luytjes of Florida International University, exports to Latin America have increased from $1.1 billion to almost $4 billion this year; imports have grown from $628 million to about $1.5 billion. Of the 13 million people who pass through Miami International Airport, nearly one-third are Latin Americans. Miami is already adding 320,000 square feet of shipping facilities near its airport; now it's building an international in-transit terminal to accommodate those who use Miami as a stopping-off point on European-Miami-Latin American routes.

One of the canniest Florida boosters is

George A. Smathers, a suave former U.S. senator and pal to John Kennedy and Bobby Baker, who is now a partner in a Miami law firm. With refreshing candor, Smathers makes it plain cronyism is the name of the game. "I traveled in just about every Latin country when I was in the Senate," he drawls in an accent thick as sorghum. "They got to calling me the senator from Latin America. I even stayed with Perón when I visited Argentina. So, sure, when my friends down there need investment advice, some of them talk to me."

There's nothing like money to heal a community's ills. Those bolivars and pesos have already eaten up the heavy inventory of condominiums left sitting on the market in 1974, gotten Florida real estate moving again and brought a competitive environment to Miami banking that has beefed up its international-trade financing. South Floridians are experts at capitalizing on their natural resources; now that the 30 miles of sandy beaches don't bring as many northerners down, they're looking in the opposite direction.

The money flood may not lead to all the international trade that Floridians hope it will. But, at the very least, it looks like one of the longest and least cyclical booms Florida has ever had. ∎