Leslie **FUDGE**, et al.,
Plaintiffs, Appellants,

v.

**PENTHOUSE INTERNATIONAL, LTD.,**
et al., Defendants, Appellees.

Leslie **FUDGE**, et al.,
Plaintiffs, Appellees,

v.

**PENTHOUSE INTERNATIONAL, LTD.,**
et al., Defendants, Appellants.

Nos. 87–1610, 87–1624.

United States Court of Appeals,
First Circuit.

Argued Dec. 11, 1987.

Decided March 1, 1988.

Stephen J. Fortunato, Jr., with whom Fortunato & Salvadore, Providence, R.I., was on brief, for plaintiffs, appellants.

Jeffrey H. Daichman, with whom Grutman Miller Greenspoon & Hendler, Washington, D.C., Dennis J. Roberts, II, and Roberts, Carroll, Feldstein & Tucker, Providence, R.I., were on brief, for defendants, appellees.

Before COFFIN, TORRUELLA and SELYA, Circuit Judges.

COFFIN, Circuit Judge.

Four schoolgirls in the eight-to-twelve-year-old range and their parents brought this action alleging that Penthouse magazine's publication of a story involving the girls was libelous, portrayed them in a false light, and constituted the intentional infliction of emotional distress. The district court granted Penthouse's motion to dismiss the complaint but denied Penthouse's motion seeking sanctions against plaintiffs and their attorney for frivolous litigation. Both parties appeal. We affirm the district court in all respects.

## I.

Plaintiffs' complaint alleged the following facts, which for the purposes of a motion to dismiss we must accept as true. In the fall of 1985, Leslie Fudge, Jennifer Ann Merritt, Tina Marie Oliver, and Renee Vincent were all students at the Oakland Beach Elementary School in Warwick, Rhode Island. In November of that year, because of apparent conflicts between some of the school's male and female students, the school's principal decided to segregate the sexes during recess periods. The *Providence Journal–Bulletin* ran an item on the story, along with a photograph showing the four girls giving the thumbs-down sign to show their disapproval of the principal's decision. The story and the picture were soon picked up by the Associated Press.

Five months later, in April of 1986, *Penthouse* magazine, which describes itself as "The International Magazine for Men," printed a slightly cropped version of the photograph that had originally appeared in the *Journal–Bulletin*, along with a one-paragraph story, under the headline "Little Amazons Attack Boys." The story appeared on page 144, in a section of the magazine entitled "Hard Times" and subtitled "A compendium of bizarre, idiotic, lurid, and ofttimes witless driblets of information culled from the nation's press." The story, which plaintiffs did not attach to their complaint, read in its entirety as follows:

The Oakland Beach Elementary School in Warwick, Rhode Island, has segregated recesses to protect the boys from the girls. "They kick them in the shins, pull their hair, and kick them ... well, in various painful places," said the principal. The fights have been occurring daily since the school year began. An 11-year-old boy said, "They beat us up all the time. I've been kicked where it counts." (*The Register–Guard*—submitted by Michel Biedermann, Springfield, Oreg.)

*In the battle of the sexes, we'd certainly score this round for the girls.— Editor*

Plaintiffs alleged that on page 72 of the same issue of *Penthouse,* in an article entitled "Good Vibrations" by one Al Goldstein, the term "amazon" was defined as "a sexually aggressive and insatiable female whose desires can only be quelled and satisfied" through the use of mechanical devices.

The girls and their parents filed this action in Rhode Island Superior Court against Penthouse International, Ltd., which owns the magazine, and Bob Guccione, the magazine's editor and publisher (hereinafter referred to collectively as "Penthouse"). The complaint alleged that the term "amazon" was libelous, that the article presented plaintiffs in a false light, and that the publication in a sexually-explicit men's magazine of the photograph of the girls constituted the intentional infliction of emotional distress. Penthouse removed the action to the federal district court based on diversity of citizenship. Penthouse then moved to dismiss the complaint for failure to state a claim and moved for Rule 11 sanctions for frivolous litigation. The district court granted the motion to dismiss but denied the motion for sanctions. All parties now appeal.

## II.

We first consider plaintiffs' claim that the district court erred in considering a copy of the article itself in ruling on the motion to dismiss. Plaintiffs did not attach a copy of the article to their complaint;

rather, Penthouse submitted the article in support of its motion to dismiss. Plaintiffs assert that under Fed.R.Civ.P. 12(b), the district court should either have excluded the article—as a "matter[ ] outside the pleading"—or treated the motion to dismiss as one for summary judgment and afforded plaintiffs an opportunity to submit additional evidentiary materials. *See Medina v. Rudman,* 545 F.2d 244, 247 (1st Cir. 1976), *cert. denied,* 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 177 (1977).[1]

█ We think the district court acted properly. Although "there is no requirement that the pleader attach a copy of the writing on which his action or defense is based[,] ... when plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading." 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1327 at 489 (1969) (citations omitted); *cf. Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.,* 805 F.2d 732, 739 n. 12 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987).

Clearly, not every document referred to in a complaint may be considered incorporated by reference and thus introduced by the moving party in support of a motion to dismiss. *See Goldman v. Belden,* 754 F.2d 1059, 1066 (2d Cir.1985) ("[L]imited quotation does not constitute incorporation by reference."); *Seidel v. Public Service Co. of New Hampshire,* 616 F.Supp. 1342, 1353 (D.N.H.1985). But here the article was not merely referred to in plaintiffs' complaint but was absolutely central to it. Plaintiffs unquestionably would have had to offer a copy of the article in order to prove their case. Moreover, plaintiffs did not and do not challenge the authenticity of the copy of the article submitted by Penthouse. Finally, plaintiffs suffered no prejudice from their lack of opportunity to submit additional evidentiary materials. Nothing they

could have introduced could have affected the disposition of the purely legal questions that the motion to dismiss raised about the article itself. We therefore see no obstacle to the district court's or our consideration of the article.

### III.

As each of plaintiffs' claims raises different legal issues, we proceed by discussing those claims *seriatim,* beginning with the libel claim and then moving on to the false light and emotional distress claims.

### A. *The Libel Claim*

We think it important to begin by setting forth the exact allegations of plaintiffs' complaint. First, plaintiffs alleged that the term "amazon" was defamatory because it imputed to the girls, who are of elementary school age, "criminality in the form of sexual activity and a lack of chastity, when, in fact, they are chaste." Second, plaintiffs alleged that the term defamed them because it "historically had, and presently has, the connotations of 'masculine woman' and 'shrew,' [when in fact] none of your minor plaintiffs have any characteristics inappropriate to their sex and age group." Third, plaintiffs alleged that the term was defamatory because it was defined in another article in the same issue of *Penthouse* as a sexually aggressive and insatiable female who uses a mechanical device for her gratification.

Under Rhode Island law, one of the elements of a libel claim is "a false and defamatory statement concerning another." *Healey v. New England Newspapers, Inc.,* 520 A.2d 147, 149 (R.I.1987). Penthouse argued below, and the district court agreed, that the libel claim should be dismissed on the ground that the term "amazon" could not possibly be "false" because it was a constitutionally-protected statement of opinion. "Under the First Amend-

---

1. We note that "any error in failing to give express notice [may be] harmless when the opponent has received the affidavit and materials, has had an opportunity to respond to them, and has not contradicted their accuracy." *Moody v. Town of Weymouth,* 805 F.2d 30, 31 (1st Cir.

1986) (per curiam). But we need not decide whether that standard is applicable here, because we hold, *infra,* that the district court properly considered the article as a part of plaintiffs' complaint.

ment there is no such thing as a false idea." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339, 94 S.Ct. 2997, 3006, 41 L.Ed. 2d 789 (1974). If the challenged statement is one of opinion rather than fact, then under the First Amendment it generally cannot give rise to a defamation claim. *See Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); *McCabe v. Rattiner*, 814 F.2d 839, 841 (1st Cir.1987); *Healey*, 520 A.2d at 150; *cf. Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284, 94 S.Ct. 2770, 2781, 41 L.Ed.2d 745 (1974). The determination whether a printed statement is protected opinion or an unprotected factual assertion is a matter of law for the court. *Ollman v. Evans*, 750 F.2d 970, 978 (D.C. Cir.1984) (en banc), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). In making this determination, we "examine the statement itself, the article as a whole, and its social context...." *McCabe*, 814 F.2d at 842. We turn now to a discussion of these three factors.

Turning first to the statement itself, we note that the word "amazon", like the word "scam" in *McCabe, id.*, does not have a single precise meaning. The pertinent dictionary definitions of "amazon" are (1) "one of a race or nation of female warriors usu[ally] associated with Scythia or Asia Minor with whom the ancient Greeks of mythology repeatedly warred," (2) "a female warrior," or (3) "a tall strong masculine woman." *Webster's Third New International Dictionary* 66 (1981).

None of these definitions imputes criminality or sexual conduct, thus negating plaintiffs' first theory of why the term is defamatory. As for plaintiffs' second theory—that the term is defamatory because it means "masculine woman"—we do not think that the phrase "masculine woman" is capable of any more precise a definition than "amazon." There is a sufficiently wide spectrum of reasonable opinion as to what constitutes appropriate gender-correlated behavior for schoolgirls that it would be impossible to prove the truth or falsity of the statement that the girls are "masculine women." *Cf. McCabe*, 814 F.2d at 842.

Plaintiffs' third theory is that the term as used in the headline on page 144 is defamatory because it is defined in another article on page 72 of the same issue of *Penthouse* as a sexually aggressive and insatiable female who uses mechanical means for her gratification. Accepting as true the allegation as to what appears on page 72, we think it only strengthens the conclusion that the term has no one precise meaning, that it is used sometimes literally and sometimes figuratively, and thus that its application to the girls cannot be shown to be either true or false. If the magazine had expressly indicated that the term as the editor used it in the headline was meant to be read together with another author's definition of the term in another, wholly unrelated article appearing 72 pages away, our conclusion might be different.[2] Absent any such indication, we do not think plaintiffs are entitled to pick and choose from among the various possible definitions of "amazon" and fasten upon the most obscure and esoteric definition simply because they find it the most offensive.

■ We therefore conclude that the characterization of the girls as "amazons," considered by itself, was not an assertion of fact but instead the statement of an opinion. It was "no more than rhetorical hyperbole...." *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. at 14, 90 S.Ct. at 1542.

A reading of the article as a whole strengthens our conclusion that the term "amazon" was an expression of opinion. The article merely narrates, in a fashion intended to be humorous, the playground skirmishes and the principal's decision to separate the sexes. Nothing in the article

---

**2.** We note, however, that in *Letter Carriers*, a union newsletter labeled plaintiffs as "scabs" and on the same page defined a "scab" as a "traitor to his God, his country, his family and his class." 418 U.S. at 267–68, 94 S.Ct. at 2773. The Court nevertheless held that the context

made clear that plaintiffs were not literally being accused of treason. *Id.* at 284–86, 94 S.Ct. at 2781–82. Thus a libel defendant's own definition of an allegedly libelous term does not require a court to ignore context in making the fact-opinion distinction.

mentions or suggests any sort of sexual conduct. Its description of girls attacking boys suggests that "amazon" was used in the sense of "female warrior" and even then only in an exaggerated, satirical manner. And plaintiffs' complaint does not challenge either the accuracy of the narrative or the use of "amazon" in its sense of "female warrior."

Finally, we look at the broader social context in which the allegedly defamatory statement appeared. As the District of Columbia Circuit has stated, "[s]ome types of writing or speech by custom or convention signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." *Ollman v. Evans*, 750 F.2d 970, 983 (D.C.Cir.1984) (en banc), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). We think that *Penthouse*'s "Hard Times" column, in which the article about the girls appeared, is an example of a well-recognized genre: articles or fragments gleaned from the nation's press, appearing under satirical headlines penned by a magazine's editors and followed by the editors' wry comments. Sometimes the editors' barbs are directed at the substance of the story, sometimes at the manner in which it was covered or not covered, and sometimes at bizarre or unfortunate typographical errors. This genre is by now common enough, across a broad spectrum of publications, that the average reader understands that the headline is the editors' ironic comment upon, rather than a literal representation of, what appears in the story reprinted from another source. Here, the editors' use of this genre, and their closing comment that "[i]n the battle of the sexes, we'd certainly score this round for the girls," clearly signalled the reader that the headline "Little Amazons Attack Boys" was satirical opinion rather than serious fact.

We also think it significant that the offending headline appeared in a magazine rather than a newspaper or some other publication. As the Eighth Circuit has observed, "[t]he magazines have a tradition of more colorful, even feisty language, than do dailies; they are also required to condense to a few paragraphs those issues to which local papers devote days of coverage and thousands of inches of space." *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1304 (8th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986). Here, as in *Janklow*, "the magazine's generally freer style of personal expression ... would signal the reader to expect a fair amount of opinion." *Id.*

There is another sense in which the larger social context suggests that the headline was a statement of opinion rather than of fact. We must acknowledge that at present there is a great deal of debate and disagreement in our society about whether and how gender affects and ought to affect behavior. Whether or not the playground incidents themselves could be characterized as matters of public concern, they certainly could be thought to implicate that larger theme. And the reader would certainly understand, after reading the editor's satirical remark about the battle of the sexes, that the editor had included the article because it described a reversal of typical sex roles. In the charged context of a debate over a matter of public concern, the reader will expect a certain amount of hyperbole and loose characterization—in short, a certain amount of opinion. This is particularly true with respect to a headline, which is commonly understood to function primarily as an attention-getter. We have no doubt that the headline in the instant case would have been taken in this spirit.

In sum, an examination of the statement, the article, and the larger social context convinces us as a matter of law that the term "amazons" was a constitutionally-protected expression of opinion. The district court therefore correctly dismissed plaintiffs' libel claim.

### B. *The False Light Claim*

Plaintiffs' complaint alleged that the headline, photograph, and narrative portrayed them in a false light by (1) implying that they consented to *Penthouse*'s use of the photograph and narrative; (2) failing to state that the girls objected to being separated from boys at recess; (3) implying an association between the plaintiffs and

*Penthouse* and an endorsement by them of *Penthouse*'s editorial views; and (4) implying that the girls were masculine in nature and wished to dominate and subdue their male schoolmates.

The Rhode Island legislature has created a statutory cause of action for portrayal in a false light, as follows:

(a) Right to Privacy Created.—It is the policy of this state that every person in this state shall have a right to privacy which shall be defined to include any of the following rights individually: ...

(4) The right to be secure from publicity that reasonably [3] places another in a false light before the public;

(A) In order to recover for violation of this right, it must be established that:

(i) There has been some publication of a false or fictitious fact which implies an association which does not exist;

(ii) The association which has been published or implied would be objectionable to the ordinary reasonable man under the circumstances;

(B) The fact which was disclosed need not be of any benefit to the discloser.

R.I.Gen.Laws § 9–1–28.1(a)(4) (1985 Reenactment).

■ The district court in the instant case concluded that because the *headline* was constitutionally-protected opinion, it could not possibly be false and thus could not meet the "false or fictitious fact" requirement of the statute. Although we agree with this characterization, we cannot agree with the district court's conclusion that this warranted dismissing the *entire* false light claim. Plaintiffs' complaint clearly alleged that not only the headline but also the photograph and narrative portrayed them in a false light. We must therefore consider whether the photograph and the narrative can support a false light claim.

In making this determination we are hampered somewhat by the lack of any precedent concerning section 9–1–28.1(a)(4). It was enacted in 1980 and has never been discussed in any reported decision of the Rhode Island courts. In construing the statute, therefore, we tread carefully, because we have little but the statutory language to guide us. We also look for analogies to the Rhode Island law of defamation, for it is widely recognized that claims for defamation and false light have much in common. *See* W. Prosser, *Law of Torts* 813 (4th ed. 1971); *Restatement (Second) of Torts* § 652E, comment b (1976). As the Fifth Circuit has noted, "[f]ederal courts have frequently noted the similarities between the two causes of action and have often carried over elements of state defamation law into their consideration of false-light invasion claims." *Braun v. Flynt,* 726 F.2d 245, 250, 252 (5th Cir.) (citing cases), *cert. denied,* 469 U.S. 883, 105 S.Ct. 252, 83 L.Ed.2d 189 (1984).

In particular, we note the rule in Rhode Island and elsewhere that "the threshold determination of whether a statement is capable of bearing a defamatory meaning is for the court to decide...." *Healey v. New England Newspapers Inc.,* 520 A.2d 147, 150 (R.I.1987) (citing *Restatement (Second) of Torts* § 614). This rule is of long standing in Rhode Island; more than ninety years ago, the Rhode Island Supreme Court stated that "if the language is not reasonably capable of conveying to the ordinary mind the defamatory meaning alleged in the innuendo, it is the province and duty of the court to so declare, and to deny the right to maintain an action thereon." *Reid v. Providence Journal Co.,* 20 R.I. 120, 122, 37 A. 637, 637 (1897).

■ We think it likely that the Rhode Island courts would apply a similar rule in the false light context: the court should make the threshold determination of whether a statement is capable of implying the objectionable association of which the plaintiff complains. Such a rule would serve the same salutary purposes as it does in the defamation context. Indeed, the *Restatement* explicitly suggests that some of

---

**3.** We are unsure whether the word "reasonably" was intended or instead was inadvertently substituted for "unreasonably." Other, similar subsections of section 9–1–28.1(a) use "unreasonably." We need not decide this question, however, as section 9–1–28.1(a)(4)(A) defines the right at issue clearly enough for our purposes.

the same restrictions applicable to defamation claims may also be applicable to false light claims. *Restatement (Second) of Torts* § 652E, comment e. The drafters note that

> When the false publicity is also defamatory so that either action can be maintained by the plaintiff, it is arguable that limitations of long standing that have been found desirable for the action of defamation should not be successfully evaded by proceeding upon a different theory of later origin, in the development of which the attention of the courts has not been directed to the limitations.

*Id. See also* Prosser at 813–14; Hill, *Defamation and Privacy Under the First Amendment,* 76 Colum.L.Rev. 1205, 1274–75 (1976). We note that a number of other courts have concluded that the court should make a threshold determination of whether the statement is capable of portraying the plaintiff in a false light. *See Braun v. Flynt,* 726 F.2d 245, 253 (5th Cir.) (applying Texas law), *cert. denied,* 469 U.S. 883, 105 S.Ct. 252, 83 L.Ed.2d 189 (1984); *Cibenko v. Worth Publishers, Inc.,* 510 F.Supp. 761, 766 (D.N.J.1981) (applying New Jersey law); *Fogel v. Forbes, Inc.,* 500 F.Supp. 1081, 1088 (E.D.Pa.1980) (applying Pennsylvania law).

■ We therefore turn to a consideration of whether the photograph and the narrative in the instant case are reasonably capable of portraying plaintiffs in a false light. We note at the outset that a publication is actionable under section 9–1–28.-1(a)(4) only if it implies "an association." Yet two of plaintiffs' allegations as to why the photograph and narrative were objectionable do not appear to imply any association at all. These allegations are (1) that the article failed to state that the girls objected to being segregated from the boys at recess, and (2) that the article implied that the girls were masculine in nature and

wished to dominate and subdue their male schoolmates. Even if these allegations did involve "associations" within the meaning of the statute, we would conclude as a matter of law that these associations would not "be objectionable to the ordinary reasonable man under the circumstances." R.I.Gen.Laws § 9–1–28.1(a)(4)(A)(ii). We therefore confine the remainder of our discussion to plaintiffs' allegations that the article implied that they had consented to publication and endorsed *Penthouse*'s editorial views.

■ We have no difficulty in concluding that the photograph and narrative were not reasonably capable of implying either consent or endorsement. The article's placement in the "Hard Times" column, which was clearly described as "a compendium" of items "culled from the nation's press," negated any inference that *Penthouse* had obtained the photograph or narrative from the plaintiffs. Moreover, any reader who missed the magazine's description of its "Hard Times" section would have reached the same conclusion after reading the narrative itself, which was clearly labeled as having been taken from a newspaper and submitted by an Oregon reader. Finally, it is worth mentioning that *Penthouse*'s editor clearly distinguished between his own comment upon the story and the story itself. Not only did he place his comment after the story and its attribution, and in a different typeface, but he expressly attributed the comment to himself. In sum, there was absolutely no room for the implication that *Penthouse* had in any way dealt with plaintiffs, or they with *Penthouse*.[4]

A comparison of two recent Fifth Circuit cases, decided under Texas law, supports this conclusion. In *Braun v. Flynt,* 726 F.2d 245 (5th Cir.), *cert. denied,* 469 U.S. 883, 105 S.Ct. 252, 83 L.Ed.2d 189 (1984), a photograph of and narrative concerning the plaintiff and her amusement park enter-

---

4. In spite of *Penthouse's* attribution of the entire item to the Oregon reader and newspaper, plaintiffs insist that their complaint alleged that the narrative was written by the *Penthouse* editor. We find no such allegation in their complaint. In any event, such an allegation would be irrelevant to the false light claim. An attribution to

another source, whether true or false, makes it equally unreasonable to infer from the face of the narrative that *Penthouse* had obtained the story directly from plaintiffs. That in turn would negate the inference, crucial to the false light claim, that plaintiffs had consented to publication or had endorsed the magazine.

**1020**

tainment partner, "Ralph, the Diving Pig" were published in *Chic,* which the court described as "a glossy, oversized, hard-core men's magazine." *Id.* at 247. The item appeared in a section of the magazine known as "Chic Thrills," a collection of brief vignettes, most of which "either concerned sex overtly or were accompanied by a photograph or cartoon of an overtly sexual nature." *Id.* But nothing in the "Chic Thrills" section attributed its contents to readers or outside sources. The Fifth Circuit concluded that the evidence supported the jury's finding that the item depicted the plaintiff in a false light, on either a consent-to-publication or an endorsement-of-editorial-views theory. *Id.* at 253–54 & n. 11.

In contrast is the more recent case of *Faloona by Fredrickson v. Hustler Magazine, Inc.,* 799 F.2d 1000 (5th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). In that case, plaintiffs had consented to be photographed in the nude for two books on human sexuality. When *Hustler* published an excerpt of one book and a review of the other, both accompanied by photographs of plaintiffs, they sued, *inter alia,* on a false light theory. *Id.* at 1002–05. The Fifth Circuit affirmed the dismissal of plaintiffs' complaint. After reviewing the context, the court concluded as a matter of law that

> no reasonable person could consider the photographs as indicating plaintiffs' approval of *Hustler,* or that they were willing to pose nude for *Hustler.* It is obvious that the photographs were reproductions from the books being reviewed or excerpted. No tie to *Hustler* is claimed or suggested. It is this sharp definition of context which distinguishes this case from ... *Braun.*

*Id.* at 1007.

The court in *Faloona* also distinguished the case before it from *Douglass v. Hustler Magazine, Inc.,* 769 F.2d 1128 (7th Cir. 1985), *cert. denied,* 475 U.S. 1094, 106 S.Ct. 1489, 89 L.Ed.2d 892 (1986). In *Douglass,* Robyn Douglass, an actress, claimed that

*Hustler* had presented her in a false light by publishing nude photographs of her and thereby implying that she had consented to the publication of the photographs. The Seventh Circuit, applying Illinois law, concluded that she had stated a claim for portrayal in a false light:

> Nothing in the feature itself suggests that the nude photographs of her are appearing without her permission and against her will, and readers might well assume that she had cooperated in the preparation of the feature in order to stimulate interest in her films. Moreover, she had been described in a previous issue of *Hustler* as a forthcoming "Hustler celebrity-exclusive," and in another issue *Hustler's* chairman, Larry Flynt, had announced in an editorial column that he does not publish photographs of women without their consent. It is (or so a jury could find) as if *Hustler* had said, "Robyn Douglass is proud to pose nude for *Hustler* magazine."

*Douglass,* 769 F.2d at 1135.

The *Faloona* court felt that the context in which the photographs were published in *Douglass* made it distinguishable from *Faloona,* where the photographs were clearly reproduced from the books being excerpted or reviewed. *Faloona,* 799 F.2d at 1007. The same is true in the case now before us; the photograph and narrative were clearly identified as having come from a third party rather than plaintiffs themselves. It follows that the article as a whole was not reasonably capable of bearing the implication of objectionable association attributed to it by plaintiffs. The district court therefore acted properly in dismissing the false light claim.[5]

### C. *The Emotional Distress Claim*

■ Plaintiffs' complaint alleged that Penthouse knew or should have known that the publication of the girls' photograph in a sexually-explicit men's magazine would offend, embarrass, shock, and outrage the girls and their parents. Although the tort of intentional infliction of emotional distress is not well-established in Rhode Is-

---

5. This disposition makes it unnecessary for us to consider Penthouse's claim that to impose liability under the false light theory advanced by plaintiffs herein would violate the First Amendment.

land, recovery is apparently possible in the debtor-creditor and employer-employee contexts for "extreme and outrageous" intentional or reckless conduct that causes severe emotional distress. *See Elias v. Youngken*, 493 A.2d 158, 163–64 (R.I.1985); *Champlin v. Washington Trust Co.*, 478 A.2d 985, 989 (R.I.1984). For the purposes of this appeal, we assume without deciding that Rhode Island would permit recovery outside of these contexts as well. *Cf. Russell v. Salve Regina College*, 649 F.Supp. 391, 400–01 (D.R.I.1986) (concluding that Rhode Island would extend parameters of intentional infliction tort to university-student relationship). We nevertheless conclude, as did the district court, that plaintiffs have failed to state an emotional distress claim.

The Rhode Island Supreme Court, in developing the law governing claims for intentional infliction of emotional distress, has relied heavily on the principles stated in *Restatement (Second) of Torts* § 46 (1964) and the comments thereto. *See Champlin*, 478 A.2d at 988–90. We assume, therefore, that Rhode Island would follow the rule stated in comment h to that section:

> It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

*Restatement* § 46, comment h. We note that the court in *Champlin* appeared to treat the question whether conduct is sufficiently extreme and outrageous as one of law. *Champlin*, 478 A.2d at 990 (seeing nothing in defendant's brief encounter with plaintiff "that could be classified as extreme and outrageous"). *Cf. Elias*, 493 A.2d at 164 (concluding that evidence did not create jury question as to whether defendant's conduct had been extreme and outrageous); *Curtis v. Rhode Island Dept.*

*for Children and Their Families*, 522 A.2d 203, 208 (R.I.1987) (same).

The "extreme and outrageous" standard is a difficult one to meet. "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Restatement* § 46, comment d. We must also recognize that conduct that is intentional or reckless and causes severe emotional distress does not *ipso facto* constitute extreme and outrageous conduct; as *Champlin* makes clear, 478 A.2d at 989, these are separate elements that must coincide to impose liability.

Accepting as true all of the factual allegations of plaintiffs' complaint, we conclude that those facts do not allege conduct that is sufficiently extreme and outrageous to warrant the imposition of liability. The essence of plaintiffs' complaint is that the mere publication of a photograph of the girls in a sexually explicit magazine was extreme and outrageous. There is nothing false, misleading, suggestive, or inherently offensive or shocking about the photograph itself; plaintiffs merely object to the material that appeared in the neighboring pages. Magazines such as *Penthouse* are sufficiently a part of the contemporary scene that their reprinting of relatively innocuous news items or photographs that have already appeared in other media simply cannot be characterized as exceeding all possible bounds of decency, atrocious, or utterly intolerable in a civilized society.[6]

## IV.

There remains the issue of Rule 11 sanctions, requested by Penthouse against plaintiffs and their attorney and refused by the district court. Penthouse, arguing that the action was frivolous, sought to recover its attorney's fees and the costs of removing and defending the action. The district court concluded that "[t]hough plaintiffs' claims have been denied, they do not rise to the level of frivolity necessary for imposition of Rule 11 sanctions."

---

6. We therefore need not consider the argument that the imposition of emotional distress liability in circumstances such as these would be barred by the First Amendment.

We review the district court's decision under Rule 11 only for abuse of discretion. *EBI, Inc. v. Gator Industries, Inc.*, 807 F.2d 1, 6 (1st Cir.1986). Here, we find none. We recognize that the costs of defending groundless claims of defamation, invasion of privacy, and/or intentional infliction of emotional distress may spur the media toward self-censorship, and we agree that Rule 11 should be used in appropriate cases to deter such groundless claims. But the application of the doctrine of constitutionally-protected opinion is not yet clear-cut, and the Rhode Island law covering false light and intentional infliction claims is not yet well settled. We therefore do not think it an abuse of discretion to conclude that this action was "warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law . . . ." Fed.R.Civ.P. 11. We do, however, award Penthouse its costs on this appeal.

*Affirmed; costs to appellees.*