**Lois GRIMSLEY, Plaintiff,**

v.

**Bob GUCCIONE and Penthouse International, Ltd., Defendants.**

**Civ. A. No. 87–T–1414–S.**

United States District Court,
M.D. Alabama, S.D.

Aug. 29, 1988.

Warren Rowe, J.E. Sawyer, Jr., Rowe, Rowe & Sawyer, Enterprise, Ala., for plaintiff.

James C. Barton, Hollinger F. Barnard, Johnston, Barton, Proctor, Swedlaw & Naff, Birmingham, Ala., for defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff Lois Grimsley has brought this lawsuit charging, among other things, that an article published in *Penthouse Magazine* defamed her, in violation of Alabama law. She has named as defendants Penthouse International, Ltd., which owns the magazine, and Bob Guccione, the magazine's editor and publisher. This court's jurisdiction has been properly invoked pursuant to 28 U.S.C.A. §§ 1332 (diversity jurisdiction), 1441 (removal jurisdiction).

Now before the court is the defendants' motion for summary judgment. The court concludes, for reasons that follow, that the motion should be granted.

## I.

In February 1986, Lois Grimsley, a forty-six-year-old security inspector at Fort Rucker, Alabama, unexpectedly gave birth to a second son. A reporter from the *Enterprise Ledger*, a local newspaper, interviewed Grimsley shortly after the birth. Grimsley provided details about the birth and posed for a photograph. An article about the birth appeared on the *Enterprise Ledger's* front page the following day. After the Associated Press picked up the story, it also appeared in several other newspapers and at least one magazine. Neither the initial publication, nor republication of slightly edited versions of the original article, bothered Grimsley in any way. Shortly after, however, Grimsley did suffer severe emotional problems growing out of her deep concern that her son may have been harmed from lack of prenatal care, or even injured during the unexpected birth.

It was not until July 1986, when a synopsis of the article appeared in *Penthouse*, the self-proclaimed "International Magazine for Men," that Grimsley found the article objectionable. The article appeared in the magazine's "Hard Times" section, which is described in the magazine as "A compendium of bizarre, idiotic, lurid, and ofttimes witless driblets of information culled from the nation's press." The following is a reproduction of the entire article:

**Birth of a Hemorrhoid**

Less than 48 hours after doctors had made their diagnosis and reassured a Florida woman that her stomach pains were nothing more than a urinary-tract infection and a case of hemorrhoids, Lois Grimsley found out otherwise, as she delivered a five-pound-14-ounce son on her bedroom floor. Doctors and Ms. Grimsley were unaware that she was even pregnant. There was no comment from the doctors, and the new mother was nearly speechless: "I can't even think of the word to describe how I felt when I saw the baby lying there." (*Pensacola News Journal*—submitted by RMC Billy-Ace Baker, Pensacola, Fla.) *So that's where babies come from.—Editor*

144 PENTHOUSE

On December 8, 1987, after *Penthouse* refused to retract the article, Grimsley filed suit in the Circuit Court of Coffee County, Alabama, claiming that the article is defamatory. After the defendants removed the lawsuit to this court based on diversity of citizenship, Grimsley amended her complaint to add claims for intentional infliction of emotional distress and invasion of privacy.

The defendants have now moved for summary judgment. They contend that they are entitled to summary judgment as a matter of state law. Furthermore, they contend that, given the backdrop of the first amendment as applied to the facts of

this case, their publication is constitutionally protected.

## II.

■ The court analyzes each of Grimsley's claims separately below, but the standard for summary judgment is the same for each claim. To prevail on a motion for summary judgment, the moving party must show, first, the absence of a genuine issue of material fact, and, second, entitlement to judgment as a matter of law. Fed.R.Civ.P. 56(c). Where the record taken as a whole, with the evidence viewed in the light most favorable to the non-moving party, could not lead a rational trier of fact to find for that party, there is no genuine factual issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Tippens v. Celotex Corp.*, 805 F.2d 949, 952–53 (11th Cir.1986).

Additionally, insomuch as this matter is based upon diversity jurisdiction, Alabama law is applicable. *See Keller v. Miami Herald Publishing Co.*, 778 F.2d 711, 714 (11th Cir.1985).

### A. Defamation

■ A plaintiff may prevail on a defamation claim only if the evidence establishes that the defendant made a defamatory *and* false statement concerning the plaintiff. *Foley v. State Farm Fire and Casualty Ins. Co.*, 491 So.2d 934, 937 (Ala. 1986); *Harris v. School Annual Publishing Co.*, 466 So.2d 963, 964 (Ala.1985); *Liberty Loan Corp. v. Mizell*, 410 So.2d 45, 49–50 (Ala.1982); *Restatement (Second) of Torts* § 558 (1977).

■ A communication is considered defamatory if it tends to harm the reputation of another so as to lower her in the estimation of the community or to deter third persons from associating or dealing with her. *Harris*, 466 So.2d at 964. Communications are often considered defamatory if they tend to expose another to hatred, ridicule, or contempt. *Restatement (Second) of Torts* § 559, Comment b (1977); *id.*, § 566, Comment d. Grimsley contends

that the defendants defamed her by exposing her to ridicule. The court need not, however, reach the issue of whether the defendants actually ridiculed Grimsley, because the evidence is clear that the *Penthouse* article was not false in any material way.

With regard to the article's headline and editorial comment, the court concludes that they cannot fairly be characterized as false. In a case very similar to this one, the First Circuit Court of Appeals observed:

> We think that Penthouse's "Hard Times" column ... is an example of a well-recognized genre: articles or fragments gleaned from the nation's press, appearing under satirical headlines penned by the magazine's editors and followed by the editors' wry comments. Sometimes the editors' barbs are directed at the substance of the story, sometimes the manner in which it was covered or not covered, and sometimes at bizarre and unfortunate typographical errors. This genre is by now common enough, across a broad spectrum of publications, that the average reader understands that the headline is the editors' ironic comment upon, rather than a literal representation of, what appears in the story reprinted from another source. Here, the editors' use of this genre, and their closing comment ... clearly signalled the reader that the headline ... was satirical opinion rather than serious fact.

*Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1017 (1st Cir.1988), *petition for cert. filed*, 56 U.S.L.W. 3834 (June 7, 1988) (No. 87–1940).

■ The *Fudge* court's observation is equally applicable to the headline about which Grimsley complains. No reasonable person could have understood it to state that a hemorrhoid was born. *Cf. Harris*, 466 So.2d at 965. Moreover, when considering the headline in light of the entire story dedicated to Grimsley, there is no question that the headline was merely an ironic comment upon that which appears in the text of the story.[1] *See Fudge*, 840 F.2d

---

1. *See Alabama Ride Co. v. Vance*, 235 Ala. 263, 178 So. 438, 440 (1938) (article should be con-

at 1017. *Cf. Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1304 (8th Cir.) (en banc), *cert. denied,* 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986). The article explains the misdiagnosis of Grimsley's condition, the photograph clearly reveals that Grimsley gave birth to a child, and the editorial comment at the bottom of the article, "So that's where babies come from," reinforces that fact. Moreover, it is clear that the editorial comment at the conclusion of the story is not a part of the story and is not a factual assertion, but is rather a comment by the *Penthouse* editor on the story itself. *See Fudge,* 840 F.2d at 1019.[2]

Finally, the text of the article is accurate in every material way. Grimsley identified only one factual error, the statement that she is "a Florida woman," and she does not claim that this error defamed her. Any other factual errors were similarly harmless and immaterial. In short, the potentially defaming fact—that Grimsley gave birth to a child without even realizing that she was pregnant—admittedly was true. Grimsley, therefore, may not recover on her defamation claim.[3]

### B. Outrage

■■■ The defendants are also entitled to summary judgment on Grimsley's claim for intentional infliction of emotional distress. This tort, which is better known in Alabama as the tort of "outrage" or "outrageous conduct," is recognized by Alabama courts as occurring when "one who by extreme or outrageous conduct intentionally or recklessly causes severe emotional distress to another." *American Road Service v. Inmon,* 394 So.2d 361, 365 (Ala.1980).[4] The tort consists of four basic

elements: (1) that the defendant knew or should have known that its conduct was likely to result in emotional outrage; (2) that the conduct was extreme and outrageous; (3) that the defendant's actions were the cause of the plaintiff's distress; and (4) that the emotional distress suffered by the plaintiff was "severe." *U.S.A. Oil, Inc. v. Smith,* 415 So.2d 1098, 1100 (Ala. Civ.App.), *cert. denied sub nom. Ex parte Smith,* 415 So.2d 1102 (Ala.1982). Grimsley's burden of proving the existence of such a tort is a "heavy" one. *Surrency v. Harbison,* 489 So.2d 1097, 1105 (Ala.1986). The determination as to whether a statement or action is sufficiently extreme or outrageous to support a cause of action for outrageous conduct is, in the first instance, one for the trial court to make as a matter of law. *Logan v. Sears, Roebuck & Co.,* 466 So.2d 121, 123 (Ala.1985); *Inmon,* 394 So.2d at 368.

■■■ For conduct to be "extreme" under Alabama law, it must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Inmon,* 394 So.2d at 365. Mere insults, indignities, threats, or annoyances are not sufficient to give rise to a tort of outrage. *Logan,* 466 So.2d at 123–24; *Inmon,* 394 So.2d at 364–65. Applying these principles, the court must conclude that *Penthouse*'s republication of the tale of Grimsley's rather surprising delivery simply does not constitute such egregious behavior as to go beyond all possible bounds

---

strued as a whole and not by its separate parts); *Labor Review Publishing Co. v. Galliher,* 153 Ala. 364, 45 So. 188, 190–91 (Ala.1907) (same). *See also Keller v. Miami Herald Publishing Co.,* 778 F.2d at 715–16.

2. As the Eleventh Circuit Court of Appeals acknowledged in *Keller v. Miami Herald Publishing Co.,* a majority of the circuits, including the Eleventh, treat statements of opinion as being protected by the first amendment. 778 F.2d at 715 & n. 11.

3. Given this holding, the court need not address the issue of what standard of care—e.g., actual

malice, negligence, etc.—is appropriate for assessing defendants' liability. As a result, the court declines the defendants' invitation to determine whether Grimsley is a public person, a limited public figure, or a private individual. *See Silvester v. American Broadcasting Co.,* 839 F.2d 1491, 1494 (11th Cir.1988).

4. *See also Archie v. Enterprise Hospital and Nursing Home,* 508 So.2d 693, 694–95 (Ala.1987); *Jackson v. Colonial Baking Co.,* 507 So.2d 1310, 1311 (Ala.1987); *Restatement (Second) of Torts,* § 46 (1965).

of decency.[5] After all, Grimsley had assisted in the preparation of the original article for the *Enterprise Ledger*. She even posed with her son for a picture—the same picture which was later run by *Penthouse.*

In addition, by the time *Penthouse* published the story, the article with text and headlines substantially similar to that found in *Penthouse,* had already appeared in newspapers in Grimsley's hometown and neighboring cities, in out-of-state newspapers, and in two national publications. By Grimsley's own account, none of these stories bothered her—only the *Penthouse* article did. It may very well be that Grimsley's distress is not based so much on the content of the article and headline as it is on the content of other articles and photographs that also appeared in the *Penthouse* issue with her story. However, the mere fact that her tale was published in *Penthouse* cannot fairly be described as extreme or outrageous. As the First Circuit concluded in *Fudge,*

> Magazines such as Penthouse are sufficiently a part of the contemporary scene that their reprinting of relatively innocuous news items or photographs that have already appeared in other media simply cannot be characterized as exceeding all possible bounds of decency,

atrocious, or utterly intolerable in a civilized society.

840 F.2d at 1021.

Furthermore, there is no evidence that Grimsley suffered any "severe" emotional distress as a result of defendants' conduct. To recover for a tort of outrage, the emotional distress suffered must be so severe that no reasonable person could be expected to endure it. *Inmon,* 394 So.2d at 365. Grimsley admits that the primary cause of her emotional problems was not the article, but the unexpected birth of her son, in particular her concern that her son may have been harmed by a lack of prenatal care or injured during the unexpected delivery. Moreover, even if republication of the article caused Grimsley, as she claims, to suffer a relapse by reminding her of the whole event, she simply has not shown that the relapse was of such severity so as to entitle her to relief.[6] *See U.S.A. Oil, Inc.,* 415 So.2d at 1100–01 (finding no "severe emotional distress" in spite of testimony that woman suffering from prior nervous condition could not sleep, was upset and frequently cried after defendant's alleged misconduct).

Finally, there is no evidence that the defendants knew, or should have known, that their conduct was likely to result in emotional distress to Grimsley.[7] As stated,

---

**5.** *See Therrell v. Fonde,* 495 So.2d 1046, 1048 (Ala.1986) (doctor who did not even look at hand of injured individual who eventually had to have finger amputated and nurse who delayed injured individual from obtaining proper treatment for over an hour did not do so in manner "so outrageous in character and so extreme in degree" as to give rise to claim); *Franklin v. Ansell, Inc.,* 489 So.2d 565, 566 (Ala. 1986) (sustaining directed verdict for defendant employer where plaintiff became upset, nervous, and unable to sleep because of false comments told to her by her supervisor); *Logan,* 466 So.2d 121 (holding as a matter of law that comment, "This guy is as queer as a three-dollar bill," about admittedly homosexual individual does not meet standard for tort of outrage); *Empiregas, Inc. v. Geary,* 431 So.2d 1258, 1260 (Ala.1983) (finding no outrageous conduct in spite of fact that, because of defendant's conduct, plaintiff was without heat for nine bitterly cold days, was unable to cook for herself and her children, and that she and her children suffered severely and became ill); *Inmon,* 394 So.2d at 367–68 (defendant was entitled to a directed verdict, even though plaintiff showed

that he (1) had been harassed, investigated without cause, accused of improper dealings, treated uncustomarily, and terminated without justification, (2) had suffered emotional distress resulting in loss of weight and insomnia, and (3) had had his honesty questioned).

**6.** Grimsley concedes that the circumstances of her son's birth are the cause of much of her emotional problems. In fact, she suffered a mild relapse in her condition on his first birthday. While the unexpected birth of her child may have caused severe emotional distress, and the boy's presence may be a constant reminder to Grimsley of the circumstances of his birth, these problems cannot be ascribed to the defendants—*Penthouse,* of course, had nothing to do with either the boy's existence or the manner in which he entered this world.

**7.** *Compare Rice v. United Ins. Co.,* 465 So.2d 1100, 1102 (Ala.1984) (defendant engaging in a pattern of harassment knew that such conduct could cause severe emotional distress and could cause severe physical damage to pregnant employee); *Cates v. Taylor,* 428 So.2d 637, 640

Grimsley was herself responsible for the initial circulation of the story; *Penthouse* merely republished the tale. Furthermore, there is no evidence in the record that the defendants knew, or should have known, that Grimsley had suffered emotional problems resulting from the birth of her son, and that the republication of the article about the birth might cause a relapse of her problems.

## C. Invasion of Privacy

 The Alabama courts have defined the invasion of privacy tort as the wrongful intrusion into one's private activities in such a manner as either to outrage a person of ordinary sensibilities or to cause such a person mental suffering, shame or humiliation. *Phillips v. Smalley Maintenance Services, Inc.*, 435 So.2d 705 (Ala. 1983). An action for invasion of privacy may be brought to remedy any of four wrongs committed by the defendant:

1. An intrusion upon the plaintiff's physical solitude or seclusion;

2. A promulgation of publicity which violates ordinary decencies;

3. Putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or

4. The appropriation of some element of the plaintiff's personality for a commercial use.

*Id.*, at 708. Although Grimsley has failed to specify the nature of her privacy claim, making evaluation of her claim somewhat difficult, the court is persuaded that the defendants are entitled to summary judgment under any theory of invasion of privacy.

### 1. *Intrusion Upon One's Solitude or Seclusion*

 In *Phillips v. Smalley Maintenance Services, Inc.*, the Alabama Supreme Court adopted the position of § 652B of the *Restatement of Torts (Second):*

One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

The actionable intrusion therefore need not be a physical invasion into the private affairs of another—some other form of investigation or examination into the individual's private concerns will suffice. 435 So.2d at 710–11. The intrusion can be a violation of some "physical place," or it can be an invasion of one's emotional sanctum—one's "personality" or "psychological integrity." *Id.* However, to be actionable, the intrusion must be such as to outrage or cause a person of ordinary sensibilities mental suffering, shame, or humiliation. *Logan*, 466 So.2d at 123.

Grimsley's claim under this theory, then, could take one of two forms: either that *Penthouse* violated her home when a complimentary copy of the magazine was sent to her, or that the publication of the story about her in the "Hard Times" column violated her "emotional" sanctum. With regards to the former contention, throughout this proceeding, Grimsley has never appeared to base her claim on this theory.[8]

---

(Ala.1983) (defendants should have known that interruption of funeral would cause severe distress). *Cf. Livingston v. Mobile Memorial Gardens, Inc.*, 504 So.2d 256, 257 (Ala.1987) (no evil intent); *Peddycoart v. City of Birmingham*, 392 So.2d 536, 540 (Ala.1980) (no prior knowledge of susceptibility to distress nor any sign of intent to inflict distress); *Inmon*, 394 So.2d at 367–68. *See also Restatement (Second) of Torts* § 46, Comment i (1965).

**8.** Furthermore, as a matter of federal constitutional law, it is questionable whether Grimsley could succeed with a claim that such a mailing invaded her right of privacy. *See Shapero v. Kentucky Bar Association*, —— U.S. ——, 108

S.Ct. 1916, 1923, 100 L.Ed.2d 475 (1988) ("A letter, like a printed advertisement ... can readily be put in a drawer to be considered later, ignored, or discarded."); *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 73, 103 S.Ct. 2875, 2883, 77 L.Ed.2d 469 (1983) ("Recipients of objectionable mailings, however, may 'effectively avoid further bombardment of their sensibilities simply by averting their eyes.' ") (citation omitted); *Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 541–42 & n. 11, 100 S.Ct. 2326, 2335–36 & n. 11, 65 L.Ed.2d 319 (1980) ("The customer ... may escape exposure to objectionable material simply by transferring the bill insert from envelope to wastebasket."). She can, however, request, pursuant to 39 U.S.C.

With regards to the latter contention, there is no evidence that the defendants published any material in which Grimsley had a legitimate expectation of privacy: Grimsley knew the material would be published when she supplied it to the *Enterprise Ledger* reporter.

### 2. *Publicity Which Violates Ordinary Decency*

■ Similarly, the fact that *Penthouse* reprinted an article that had been published by other news media, and that had originally been prepared with Grimsley's own assistance was not offensive publicity which invaded Grimsley's private life. Under this theory, liability occurs only when the matter publicized is (i) highly offensive to a reasonable person, and (ii) not of legitimate concern to the public. *Restatement (Second) of Torts* § 652D (1977). *See* W. Keeton, *Prosser & Keeton on The Law of Torts* 856–57 (5th ed. 1984). However, a defendant who merely gives further publicity about a plaintiff concerning information already made public cannot be held liable. *Abernathy v. Thornton*, 263 Ala. 496, 83 So.2d 235, 237 (1955); *Restatement (Second) of Torts* § 652D, comment b (1977).[9] Thus, a claim under this theory does not exist, when, as here, the individual consents to and assists in the publication of the facts discussed in the story at issue. *Abernathy*, 83 So.2d at 237 (quoting Hepburn, *Cases on Torts* 504).

### 3. *"False Light" Invasion of Privacy*

There is no evidence that the defendants placed Grimsley in a false light. To the extent Grimsley claims the article makes false or misleading statements, the false light claim is indistinguishable from the

defamation claim. *See Fudge*, 840 F.2d at 1018; *Braun v. Flynt*, 726 F.2d 245, 250, 252 (5th Cir.), *cert. denied*, 469 U.S. 883, 105 S.Ct. 252, 83 L.Ed.2d 189 (1984).[10] To the extent Grimsley claims that the article and picture imply an association with *Penthouse* under either a "consent to publication" theory or an "endorsement of views" theory, the evidence does not bear out the claim. In *Fudge*, the First Circuit dismissed an identical claim:

> We have no difficulty in concluding that the photograph and narrative were not reasonably capable of implying either consent or endorsement. The article's placement in the "Hard Times" column, which was clearly described as "a compendium" of items "culled from the nations's press," negated any inference that *Penthouse* had obtained the photograph or narrative from the plaintiffs. Moreover, any reader who missed the magazine's description of its "Hard Times" section would have reached the same conclusion after reading the narrative itself, which was clearly labeled as having been taken from a newspaper and submitted by an Oregon reader. Finally, it is worth mentioning that *Penthouse*'s editor clearly distinguished between his own comment upon the story and the story itself. Not only did he place his comment after the story and its attribution, and in a different typeface, but he expressly attributed the comment to himself. In sum, there was absolutely no room for the implication that *Penthouse* had in any way dealt with plaintiffs, or they with *Penthouse*.

*Id.*, 840 F.2d at 1019.[11] Except for the insignificant fact that the *Penthouse* story

---

A. §§ 3008, 3010(b), that she receive no further mailings which she believes are erotically arousing, sexually provocative, or otherwise personally offensive. *See Rowan v. Post Office Department*, 397 U.S. 728, 737, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970).

**9.** *See Faloona by Frederickson v. Hustler Magazine, Inc.*, 799 F.2d 1000, 1006 (5th Cir.1986) (publication by sexually explicit magazine of a book review with accompanying photographs revealed no private facts when photographs had been widely published elsewhere), *cert. denied*,

479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987).

**10.** *See also Restatement (Second) of Torts* § 652E, Comment b (1977); W. Keeton, *Prosser and Keeton on The Law of Torts* 864–65 (5th ed. 1984).

**11.** *See also Faloona by Fredrickson v. Hustler Magazine, Inc.*, 799 F.2d 1000, 1006–07 (5th Cir. 1986), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). *Compare Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1135 (7th Cir.1985), *cert. denied*, 475 U.S. 1094, 106 S.Ct.

on Grimsley has first appeared in the *Pensacola News Journal* and was submitted by a Florida reader, the *Fudge* court might well have been referring to this matter.

### 4. *Appropriation for Commercial Use*

Finally, there is no evidence to suggest that *Penthouse* appropriated Grimsley's name, story, or photograph for some commercial or other advantage. *See Restatement (Second) of Torts* § 652C (1977); W. Keeton, *Prosser & Keeton on The Law of Torts* 852–53 (5th ed. 1984). Penthouse clearly has not used the Grimsley story to advertise the contents of its magazine or to increase sales.[12] Indeed, there is no evidence that the inclusion of the story of her giving birth was cause for any increased sales for *Penthouse.*

### III.

As the defendants are entitled to summary judgment under state law on each of Grimsley's claims, the court need not address what further protections the first amendment provides to the defendants.[13]

An appropriate judgment will be entered.

---

1489, 89 L.Ed.2d 892 (1986); *Wood v. Hustler Magazine, Inc.,* 736 F.2d 1084, 1092 (5th Cir. 1984), *cert. denied,* 469 U.S. 1107, 105 S.Ct. 783, 83 L.Ed.2d 777 (1985); *Braun v. Flynt,* 726 F.2d 245, 247 (5th Cir.), *cert, denied sub nom. Chic Magazine, Inc. v. Braun,* 469 U.S. 883, 105 S.Ct. 252, 83 L.Ed.2d 189 (1984).

**12.** *See Faloona v. Hustler Magazine, Inc.,* 607 F.Supp. 1341, 1360 (N.D.Tex.1985) ("the defendant must have capitalized upon the likeness of that person to sell more magazines or newspapers"), *aff'd,* 799 F.2d at 1006 (5th Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987); *Ann–Margaret v. High Society Magazine, Inc.,* 498 F.Supp. 401, 406 (S.D.N.Y.1980). *Compare Cher v. Forum International, Ltd.,* 692 F.2d 634, 639–40 (9th Cir.1982), *cert.*

*denied,* 462 U.S. 1120, 103 S.Ct. 3089, 77 L.Ed.2d 1350 (1983).

**13.** *See Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); *Greenbelt Cooperative Publishing Ass'n v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).