**Walter McELROY, Plaintiff,**

v.

**TNS MILLS, INC., et al., Defendants.**

**Civil Action No. 95–D–338–N.**

United States District Court,
M.D. Alabama,
Northern Division.

Aug. 28, 1996.

Banks Thomas Smith, Eugene P. Spencer, II, Dothan, AL, for plaintiff.

Steadman Shealy, Jr., Richard E. Crum, Dothan, AL, for defendants.

### MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court is defendants TNS Mills, Inc. ("TNS"), and Tommy Brooks' ("Brooks") motion filed December 4, 1995, for summary judgment. Plaintiff Walter McElroy ("McElroy") filed a response in opposition on February 26, 1996. The defendants then filed a reply to the plaintiff's response on March 21, 1996. After careful consideration of the arguments of counsel, the relevant case law and the record as a whole, the court finds that the defendants' motion is due to be granted in part and denied in part.

### FINDINGS OF FACT

Plaintiff McElroy alleges in his complaint that he has been subjected to (1) sexual harassment, (2) racial discrimination, (3) retaliatory discharge, (4) the tort of assault and battery, and (5) the tort of outrage. Because McElroy admits that he cannot produce evidence sufficient to overcome the defendants' motion for summary judgment as to his claims of racial discrimination and assault and battery, the court finds that the defendants' motion as to these two claims is due to be granted. The court further finds that based on the facts and the law, as discussed below, McElroy's claims for sexual harassment and retaliatory/constructive discharge raise disputes of material fact which should be addressed by a jury; thus, the court finds that the defendants' motion for summary judgment as to these two claims is due to be denied. The court further finds that the defendants' motion for summary judgment as to McElroy's claim under the tort of outrage is due to be granted.

McElroy began working for TNS on February 8, 1987, as a forklift operator in the warehouse at a wage of $5.01. He was transferred and promoted within TNS from this position to warehouseman, lead warehouse-

man, lift truck operator, and then to overhaul helper. McElroy's Dep. at 11–17. Over this time, McElroy received regular pay increases, and, as of September 20, 1993, he was making $9.40 an hour. *Id.* at 16. McElroy's supervisors described him as a fair employee, and he received at least four employee reprimands for poor job performance. *See* Def.'s Exh. 2.

On September 3, 1993, McElroy applied for a job as a card technician trainee because it was a promotion and would provide an increase in pay. *Id.* at 17–18. McElroy knew that Tommy Brooks would be his supervisor if he were granted the promotion. *Id.* at 59. McElroy was subsequently promoted to the position. *Id.* at 18. McElroy was often late to work, and sometimes failed to show up for work. *See* Def.'s Exh. 3. In fact, McElroy received a formal reprimand on November 25, 1993, for causing the entire shift to shut down by failing to perform his job, and received a formal reprimand on January 4, 1994, for repeated absences. *Id.* It was understood by many employees who worked with McElroy that he had a drinking problem, and that this condition was the likely cause of many of his problems after his transfer. Anderson's Aff. at 1.

While McElroy was employed under Brooks' supervision, Brooks would often tell him that he smelled nice and looked good in his uniform, which made McElroy uncomfortable. *Id.* at 74–76. He would also make comments to McElroy about the appearance of other men. *Id.* These comments would occur about twice a week. *Id.* at 33–34. Brooks never made any physical contact with McElroy. *Id.* McElroy complained to supervisors Billy Childree, Bobby Hagler, and Max Townsend about the problems he was having with Brooks, but they basically laughed or did not take his complaints seriously. *Id.* at 36–37, 40–41. Also, McElroy was subjected to kidding and teasing by his co-workers almost every night and every morning about having to work by himself with Brooks on the third shift. *Id.* at 45. Several other co-workers of McElroy had similar experiences with Brooks, which they reported to the same supervisors to whom McElroy reported his unwelcomed encounters with Brooks. *See* Dep. of Daniel Johnson and Michael Kelley.

According to Lisa Leskin ("Leskin"), Brooks' former wife told Leskin that Brooks was a closet homosexual and that Brooks himself had indicated to her that he was a homosexual. Leskin's Dep. at 11. She also testified that Brooks attended a bar which was frequented by homosexuals. *Id.* at 14–15.

TNS records reflect that following his transfer to the late-night third shift, McElroy was often late to work, and in fact failed to come in at all on numerous occasions. *See* Def.'s Exh. 3. On March 8, 1996, approximately two days before McElroy ceased working for TNS, he reported to plant personnel that his grandmother had died and that he would, as a consequence, miss some time from work. Brooks' Dep. at 28. McElroy returned to work on March 10, 1996, and prior to the start of his scheduled shift, he encountered Virgil Anderson. Brooks' Dep. at 31. According to Anderson, McElroy smelled strongly of alcohol and appeared to be highly intoxicated because his speech was slurred, his eyes were hazy and red, and he acted and moved in an uncontrollable manner. Anderson's Aff. at 1. Anderson reported the encounter to Brooks, who was his supervisor. *Id.*

As a result, Brooks confronted McElroy in front of the restroom and noticed that McElroy's breath strongly smelled of alcohol. Brooks' Dep. at 32. He asked McElroy if he had been drinking. *Id.* McElroy denied that he had been drinking and became angry. *Id.* Brooks told him that he should just clock out and come back to talk to plant personnel the next day. *Id.* McElroy returned to demand his tools, stating that he was just going to quit and refusing to speak about the matter further. *Id.* at 33. His request for the tools was denied, and McElroy left the plant and did not return that night. *Id.* at 34. McElroy maintains that he had not been drinking alcoholic beverages that night and that he was not intoxicated. McElroy's Dep. at 20.

McElroy met with the plant superintendent, Paul Godwin, the next day. Godwin's Dep. at 11–12. Godwin attempted to per-

suade McElroy that it would not be in his best interest to quit, but he was unsuccessful. *Id.* McElroy remained adamant that he was quitting but gave Godwin no specific reason for doing so, stating that he should talk to Max Townsend because Townsend "knows everything." *Id.* at 12. At no time during this conversation did McElroy indicate that his quitting had anything to do with Brooks, or that he felt that he had been subjected to any type of sexual harassment. *Id.* at 11. Nevertheless, McElroy claims that he was terminated from the position. McElroy's Dep. at 20.

Subsequent to leaving his employment with TNS, McElroy filed a claim with the Equal Employment Opportunity Commission alleging that he had been subjected to same-gender sexual harassment by Brooks. His EEOC claim was denied, and McElroy timely filed suit in this court after receiving his right to sue letter.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court has stated:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Court has noted, on the other hand, that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judg-

ment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). Summary judgment is improper "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510. *See Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989). At the summary judgment stage, the court must construe the evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553 (citing Fed.R.Civ.P. 56(c)).

### DISCUSSION

Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1). This section prohibits an employer from sexually harassing its employees. In *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65–66, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986), the Supreme Court of the United States recognized two distinct types of sexual harassment under Title VII: *quid pro quo* harassment and hostile work environment harassment. Here, plaintiff seeks relief under sexual harassment caused by a hostile work environment. The determination of sexual harassment should be based upon an analysis of all the circumstances. *See Id.* at 59, 106 S.Ct. at 2401–02; *see also* EEOC Guidelines, 29 C.F.R. § 1604.11(b) (1988).

## I. Same-sex Sexual Harassment

### A. *Whether a cause of action exists for same-sex harassment.*

In the instant case, the plaintiff's claims are based on same-sex hostile work environment harassment. The defendants argue that an action should not lie for same-sex hostile work environment harassment. In support, they note that several recent decisions have held that Congress did not intend to create an action for same-sex hostile work environment harassment. *See Garcia v. Elf Atochem North America*, 28 F.3d 446 (5th Cir.1994) (Harassment by a male supervisor against a male subordinate was not cognizable under Title VII even if harassment had sexual overtones.); *Hopkins v. Baltimore Gas & Electric Co.*, 871 F.Supp. 822 (D.Md. 1994) (Title VII does not provide a cause of action for an employee who claims to have been a victim of sexual harassment by a supervisor or co-worker of the same gender.); *Vandeventer v. Wabash Nat'l Corp.*, 867 F.Supp. 790 (N.D.Ind.1994) (Same-sex harassment is not actionable under Title VII.); *Goluszek v. Smith*, 697 F.Supp. 1452 (N.D.Ill.1988) (Plaintiff did not have a cognizable Title VII claim where the plaintiff alleged he was sexually harassed by his male co-workers.).

■ The defendants correctly point out that the question has not been addressed by the Eleventh Circuit Court of Appeals. However, several courts in this district, including this one, have discussed the distinction between *quid pro quo* sexual harassment and hostile work environment sexual harassment in the context of same-sex sexual harassment and have determined that such a distinction is irrelevant as to whether a cause of action should lie. *See Prescott v. Independent Life and Acc. Ins. Co.*, 878 F.Supp. 1545 (M.D.Ala.1995) (Albritton, J.) (Although the plaintiff only brought an action for same-sex quid pro quo sexual harassment, the court found that that plaintiff also had a cause of action for same-sex hostile work environment sexual harassment under Title VII because the treatment that the plaintiff allegedly received was based on his gender.); *see also Does v. Covington Cty. Sch. Bd. of Ed.*, 930 F.Supp. 554 (M.D.Ala.1996) (De Ment, J.) (Plaintiff has cause of action for same-sex hostile work environment sexual harassment under Title IX). Based on these cases, the court finds that a cause of action exists under Title VII for same-sex hostile work environment sexual harassment.

Accordingly, the court will now address the merits of the plaintiff's action for same-sex hostile work environment sexual harassment. As an initial matter, the court notes that defendant Tommy Brooks has moved for summary judgment as to all Title VII charges against him, asserting that under Title VII he cannot be held liable in his individual capacity. The court agrees.

### B. *Whether Brooks can be sued in his individual capacity.*

■ The law is clearly established in the Eleventh Circuit that "[i]ndividual capacity suits under Title VII are ... inappropriate. The relief granted under Title VII is against the employer; not individual employees whose actions would constitute a violation of the Act." *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991) (per curiam) (citations omitted) (emphasis original). The opinion continues by stating that " ... the proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the *supervisory employees* as agents of the employer or by naming the employer directly." *Id.* (emphasis supplied); *see e.g., Smith v. Capitol City Club of Montgomery*, 850 F.Supp. 976, 979 (M.D.Ala.1994) (Thompson, J.) (finding that the 1991 Amendments to Title VII of the Civil Rights Acts did not affect the validity of *Busby* ). Thus, the significance of *Busby* is that "even though Congress defined 'employer' to include 'any agent,' 42 U.S.C.A. § 2000e(b), this provision does not impose individual liability but only holds the employer accountable for the acts of its individual agents." *Id.* at 978.

Here, it is unclear whether McElroy is suing Brooks in his individual capacity, as an agent of defendant TNS, or both. To the extent that the plaintiff seeks relief from Brooks in his individual capacity, the plaintiff's suit cannot be maintained.

### C. Whether Brooks' conduct constituted hostile work environment harassment.[1]

McElroy contends that the alleged sexual harassment created a hostile work environment. To maintain a Title VII claim under this theory of sexual harassment, an employee must prove the following five elements: (1) the employee must belong to a protected class—in the instant case, the employee must be male; (2) the sexual harassment must be unwelcomed; (3) the harassment must be based on gender; (4) the harassment must affect a term, condition, or privilege of employment; and (5) here, the employee must establish liability based on the theory of respondeat superior.[2] *Henson*, 682 F.2d at 903–905.

█ The defendants concede that if the court finds that a cause of action exists for same-sex sexual harassment that the plaintiff, construing the facts in a light most favorable to him, has established the first two prongs of a prima facie case. Moreover, notwithstanding the defendants' arguments otherwise, the court finds that the plaintiff has established that a question of fact exists as to whether the comments made to McElroy by Brooks were based on gender.[3] Thus, the court finds that McElroy has met the third element of a prima facie case of hostile work environment sexual harassment.

█ The court further finds that McElroy has established a question of fact as to the fourth element of the test. This element requires a plaintiff to show that the harassment in its totality is "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 20–24, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993). The pervasiveness of the conduct turns "not only on the frequency of the incidents, but the gravity of the incidents as well." *Vance v. Southern Bell Tel. and Tel. Co.*, 863 F.2d 1503, 1511 (11th Cir.1989). While a " 'mere utterance of an . . . epithet which engenders offensive feelings in an employee,' does not sufficiently affect the conditions of employment to implicate Title VII," the environment does not have to be so severe as to cause a "nervous breakdown" or "seriously affect employees' psychological well-being." *Harris*, 510 U.S. at 22, 114 S.Ct. at 370–71 (citations omitted). Factors a court should consider include (1) the frequency of the discriminatory conduct, (2) its severity, (3) whether it was physically threatening or humiliating, or merely an offensive utterance, and (4) whether it unreasonably interfered with the employee's work performance. *Id.* at 20–22, 114 S.Ct. at 370.

The defendants argue that the alleged conduct does not rise to a level pervasive enough to constitute hostile work environment harassment within the meaning of Title VII. In this regard, it is clear in this case that the only allegedly harassing conduct made by Brooks directly toward McElroy consisted of comments that McElroy smelled nice, that he liked his cologne, and that he looked good in

1. Under Title VII, "abusive work environment" is interchangeable with "hostile work environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 17–20, 114 S.Ct. 367, 369, 126 L.Ed.2d 295 (1993).

2. The shifting burdens of proof and production employed in Title VII disparate treatment cases, as mandated by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), do not apply to sexual harassment claims based on hostile work environment. *Henson v. City of Dundee*, 682 F.2d 897, 905 n. 11 (11th Cir.1982). As explained in *Henson*, the *McDonnell* analysis "serves to 'progressively sharpen the inquiry into the elusive factual question of intentional discrimination,' [citation omitted] in a case where prohibited criteria and legitimate job related criteria often blend in the employment decision." *Id.* In contrast, a hostile work environment claim "does not present a factual question of intentional discrimination which is at all elusive." *Id.*

3. With all deference, the Court declines to follow the Fourth Circuit Court of Appeals which holds that a hostile environment "claim does not lie where both the alleged harassers and the victims are heterosexuals of the same sex." *Mayo v. Kiwest Corporation*, 1996 WL 460769 (1996) (citations omitted). The gravamen of the cause of action is the creation of a hostile work environment based on *gender*. Hence, whether or not either party is homosexual seems to the Court to be immaterial. However, whether or not the alleged harasser is homosexual is surely admissible on the issue of motive which is not here a necessary element for a cause of action, but may always be proved.

his uniform and that it fit him well. However, it is also clear that said conduct by Brooks occurred on a fairly regular basis, i.e., at least twice a week for more than six months. McElroy further testified that he reported Brooks' offensive conduct to three separate supervisors, each of whom essentially ignored his complaints. Moreover, McElroy was often teased by his co-workers whenever he worked with Brooks by himself because of the comments Brooks made to him on a regular basis. Based on these facts, the court finds that such conduct raises an issue of material fact as to whether the conduct of Brooks was pervasive enough to affect the terms and conditions of McElroy's employment. *See generally Splunge v. Shoney's, Inc.,* 874 F.Supp. 1258 (M.D.Ala.1994) (De Ment, J.).

Finally, as to the fifth element, i.e., whether the employer knew of the problem and failed to take prompt remedial action, the court finds unpersuasive at this stage of the litigation the defendants' arguments that McElroy's supervisors were never informed of any harassment. There is no question that McElroy has testified in his deposition that he informed Billy Childree, Bobby Hagler, and Max Townsend of the alleged harassment. The defendants contend that each of these supervisors testified that they were not informed. The court finds that this inconsistency creates a question of fact for the jury to determine. Thus, the court finds that the defendants' motion for summary judgment as to McElroy's claim for same-sex hostile work environment sexual harassment is due to be denied.

## II. Retaliatory/Constructive Discharge

▮▮▮ The court likewise finds that a jury could find TNS liable under a constructive discharge theory because a reasonable juror could conclude that the working conditions were "so difficult that a reasonable person in the employee's position would feel compelled to resign." *Derr v. Gulf Oil Corp.,* 796 F.2d 340, 344 (10th Cir.1986). In *Hill v. Winn–Dixie,* 934 F.2d 1518 (11th Cir.1991), the Eleventh Circuit repeated the familiar standard by which constructive discharge claims are analyzed:

'The law in this circuit with respect to constructive discharge is well-established. To show constructive discharge, the employee must prove that his [or her] working conditions were so difficult or unpleasant that a reasonable person would have felt compelled to resign.' Before finding a constructive discharge, this court has traditionally required a high degree of deterioration in an employee's working conditions, approaching the level of 'intolerable.'

*Id.* at 1527 (citations omitted). A reasonable employee is one who does not "assume the worst" or "jump to conclusions too fast." *Garner v. Wal–Mart Stores, Inc.,* 807 F.2d 1536, 1539 (11th Cir.1987). If the intolerable working conditions are the result of a hostile work environment caused by sexual harassment, then the constructive discharge violates Title VII. *Henson v. City of Dundee,* 682 F.2d 897, 907 (11th Cir.1982).

In the instant action, the defendants argue that McElroy failed to give any reason for his discharge; thus, they contend that there is no causal connection between the alleged harassment and McElroy's decision to leave. However, it is clear that on the day McElroy left TNS, he indicated to Paul Godwin, his personnel director, that Max Townsend knew the reason that he was leaving. Construing this comment in a light most favorable to the plaintiff, combined with McElroy's testimony that he had informed Townsend of the problems he had been having with Brooks, the court finds that a reasonable juror could find a causal connection between McElroy's decision to leave and Brooks' conduct toward McElroy. The court further finds that the conduct attributed to TNS—alleged persistent unwelcomed sexually harassing comments—is the type of conduct that could make working conditions so intolerable that a reasonable person would feel compelled to resign. Accordingly, the court finds that TNS's motion for summary judgment as to McElroy's constructive discharge claim is due to be denied.

## III. Tort of Outrage

▮▮▮ Finally, the court will address McElroy's claim for outrageous conduct brought under the tort of outrage. The Su-

preme Court of Alabama has restricted the confines of this tort, allowing recovery "only in the most egregious circumstances." *Thomas v. BSE Indus. Contractors, Inc.*, 624 So.2d 1041, 1044 (Ala.1993). To establish a prima facie case of outrage, "the plaintiff must present sufficient evidence that the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Id.* at 1043 (citing *American Road Service Co. v. Inmon*, 394 So.2d 361 (Ala.1981) (adopting the tort of outrage in Alabama)). The conduct complained of must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *American Road Serv. Co.*, 394 So.2d at 365.

The initial determination as to whether a statement or action is sufficiently extreme or outrageous to support a cause of action for outrageous conduct is for the trial court to make as a matter of law. *Grimsley v. Guccione*, 703 F.Supp. 903, 907 (M.D.Ala.1988) (Thompson, J.). In this regard, the Court in *Thomas*, after citing twenty Alabama cases where no jury question was presented on a claim for outrage, stated three limited circumstances where Alabama courts have allowed this claim to go to the jury:

> (1) cases having to do with wrongful conduct in the context of family burials, *see Whitt v. Hulsey*, 519 So.2d 901 (Ala.1987) (reckless desecration of family burial ground by adjacent landowner sufficient to present a jury question as to claim of outrage), *Levite Undertakers Co. v. Griggs*, 495 So.2d 63 (Ala.1986) (defendant undertaker's wrongful retention of the remains of plaintiff's husband to force payment of funeral expenses sufficient to present a jury question as to claim of outrage), and *Cates v. Taylor*, 428 So.2d 637 (Ala.1983) (defendant's withdrawal of permission to use a burial plot 30 minutes before the planned burial sufficient to present a jury question on claim of outrage); (2) a case where insurance agents employed heavy-handed barbaric means in attempting to coerce the insured into settling an insur-

> ance claim, *National Security Fire & Cas. Co. v. Bowen*, 447 So.2d 133 (Ala.1983); and (3) a case involving egregious sexual harassment, *Busby v. Truswal Corp.*, 551 So.2d 322 (Ala.1989).

624 So.2d at 1044.

■ Although the court is sympathetic to McElroy's situation and in no way wishes to condone the type of actions allegedly taken by Brooks, the court finds compelling the fact that in every case where Alabama courts have allowed this issue to go to the jury, the allegations have been far more egregious than those presented in this case. Given the limited nature of this cause of action, the court finds that the record simply does not disclose facts so poignant as to rise to the level of outrage. Because the court finds that McElroy has failed to carry his burden of proving a claim of outrage, summary judgment as to the tort of outrage claim is due to be granted.

## CONCLUSION

Based on the foregoing, it is CONSIDERED and ORDERED that defendant Tommy Brooks' motion for summary judgment be and the same is hereby GRANTED as it relates to plaintiff Walter McElroy's Title VII claims.

It is further CONSIDERED and ORDERED that defendant TNS Mills and Tommy Brooks' motion for summary judgment as to plaintiff Walter McElroy's claims under the tort of outrage, assault and battery, and race discrimination be and the same is hereby GRANTED.

It is further CONSIDERED and ORDERED that defendant TNS Mills' motion for summary judgment as to plaintiff's Walter McElroy's claims of sexual discrimination and constructive discharge be and the same is hereby DENIED.